THE STATE OF UTAH, Respondent, v. PETER MORTENSEN, Appellant.

No. 1457. (73 Pac. 562, 633.)

1. **Criminal Law: Homicide: Evidence: Stipulation: Confrontation by Witness.**
Where, in a prosecution for homicide, defendant entered into a stipulation in open court at the trial admitting that if a certain witness were present he would testify to certain facts, and agreeing that it should be received in evidence and considered by the jury, he could not subsequently contend that the admission of such stipulation was erroneous, on the ground that it was a violation of his right to be confronted by witnesses, conferred by Constitution, article 1, section 12, as such right can be waived.

2. **Same.**
Where, in a prosecution for homicide, the state contended that defendant lured deceased to defendant's residence in the night-

time on the pretense that he would then pay an account owing to deceased, amounting to $3,800, on the delivery of a note and certain receipts which deceased had in his possession, but that defendant did not have the money to pay his debt and killed deceased to get possession of the papers, the admission in evidence of a stipulation that if a certain witness was present he would testify that between November 2d and December 16th, the day of the homicide, he had paid defendant various sums of money amounting to $2,150, if error, was harmless.

**3. Same: Evidence: Bank Account.**

Where the State's theory in a prosecution for homicide was that defendant killed deceased in order to get possession of certain papers evidencing an indebtedness, without making payment, evidence respecting the amount of defendant's bank account at the time was admissible.

**4. Same: Evidence: Admission by Silence.**

Defendant was suspected of having killed deceased, and after deceased's body had been dug up, and while it was lying in a patrol wagon, deceased's father said, while defendant was within six or eight feet from him and near the vehicle, as though talking to the body, "He murdered you for a receipt that was on your body representing $3,800, and you never ran away, nor he never gave you a dollar." *Held,* in a prosecution of defendant for the homicide, that such statement by the father, and the fact that defendant said nothing in reply, but hung his head and looked on the ground, was admissible as an admission indicative of guilt.

**5. Same: Evidence: Expert: Physician.**

In a prosecution for homicide, evidence of a physician who performed an autopsy on decedent's remains, and made an expert examination of his stomach, as to the probable length of time which intervened from the time deceased had eaten his supper on the night of the homicide until his death, as indicated by the stage of digestion, was properly admitted.

**6. Same: Evidence: Intent.**

Where, in a prosecution for homicide, the State claimed that defendant induced deceased to come to his house on the evening of the homicide in order that defendant might pay deceased a sum of money owing to him, evidence of decedent's wife that, after deceased had eaten his supper that night, as he was about to leave the house he told her he was going to defendant's for a few minutes to collect some money, and would be back soon, was admissible as tending to show decedent's intent, though the statement was made in defendant's absence.

**7.  Same: View: Absence of Defendant.**

> Where, in a prosecution for homicide, at the close of the evidence, the prosecution requested the court to direct a view of the premises, and defendant's counsel stated that they had no objection, but did not desire that accused should accompany the jury, the court's failure to compel accused so to do was not erroneous as in violation of Constitution, article 1, section 12, guaranteeing to defendant the right of confrontation of witnesses.

**8.  Same: View: Trial: Statutes: Construction.**

> Constitution, article 1, section 12, provides that in criminal prosecution the accused shall be confronted by the witnesses against him, and have a speedy public trial by an impartial jury. Revised Statutes, section 4811, declares that if the prosecution is for a felony the person must be personally present at the trial. Section 4870 authorizes the court to order the jury to take a view of the place where the offense was committed, the jury to be conducted thither in a body in custody of an officer, who is to suffer no person to speak or communicate with the jury, or do so himself, on any subject connected with the trial, and return them into court without any unnecessary delay. *Held,* that the word "trial," as used in the constitutional provision and in section 4811, was limited to the proceedings conducted in the place where the court was held, which did not include the view, and hence section 4811 did not require that the defendant should be personally present while the jury were taking a view.

**9.  Same: View: Not Evidence.**

> A view is not the taking of testimony within the meaning of the Constitution, but its sole purpose and object is to enable the jurors to more accurately understand and more fully appreciate the testimony of witnesses given before them.

**10.  Same: View: Right to Compel Defendant's Presence.**

> In a prosecution for homicide, where the State moved the court for a view and defendant objected to being required to accompany the jury, the court was not authorized to compel him to do so, since such an order would in effect compel defendant to give evidence against himself.

**11.  Same: Adopted Statute: Construction.**

> The rule that where the Legislature adopts a statute from a sister State, which has been construed by the courts of such State, it also adopts the interpretation which such State has placed upon it, is not absolutely conclusive on the courts of the State

State v. Mortensen.

adopting the statute, and does not prevent them from refusing to follow such interpretation.[1]

12. **Same: View: Misconduct of Jury: Harmless.**

Where, in a prosecution for homicide, a view was ordered by the court, the fact that certain of the jurors, while viewing the premises, paced off distances between certain points referred to in the testimony, was not such misconduct as vitiated their verdict.

13. **Same: Evidence: Cross-Examination: Fruit of Counsel's Own Conduct as Error: Practice Disapproved.**

In a prosecution for homicide, decedent's father as a State's witness was not asked on direct examination concerning an alleged revelation from God. On cross-examination counsel for defendant persistently interrogated witness as to such revelation, whereupon he reluctantly stated that it had been revealed to him that defendant had murdered his son, and that the latter's body would be discovered in one of the fields surrounding defendant's residence. *Held,* that the failure of the court to strike out such evidence on its own motion, and its refusal to charge the jury that they should not consider any statements as to such revelation except in determining the credibility of the witness, was not error.

14. **Same: New Trial: Oral Evidence.**

In a prosecution for homicide it was not error for the court to refuse to permit defendant to introduce oral evidence in support of his motion for a new trial.

## (Decided August 12, 1903.)

Appeal from the Third District Court, Salt Lake County.—*Hon. C. W. Morse,* Judge.

The defendant was convicted of murder in the first degree and sentence of death having been pronounced against him, he appealed.

AFFIRMED.

[1] Coulam v. Doull, 4 Utah 267, 9 Pac. 568; Dixon v. Ricketts, 26 Utah 215, 72 Pac. 947; Matthews v. Jensen, 21 Utah 207, 61 Pac. 303.

*Messrs. Stewart & Stewart* for appellant.

*Hon. M. A. Breeden,* Attorney-General, *Hon. W. R. White,* Deputy Attorney-General, and *Dennis C. Eichnor,* District Attorney, for the State.

### STATEMENT OF FACTS.

The information in this case charges the defendant with the unlawful, deliberate, and malicious murder, on the 16th day of December, 1901, of James R. Hay. Among other things, it appears from the evidence that the accused and the deceased were both residents of Forest Dale, Salt Lake county, Utah. The deceased was the secretary and treasurer of the Pacific Lumber Company, a concern dealing in lumber. The defendant was a contractor and builder, and before and at the time the crime charged was committed was indebted to the lumber company for lumber and building materials. Having been frequently asked by an agent of the lumber company for money in liquidation of the indebtedness, the defendant, on the 14th of December, 1901, appeared at the office of the company in Salt Lake City, and stated to its manager, Mr. Romney, that he thought he would be able to pay the account on the 16th of December, 1901. On the afternoon of the 16th, at about 6 o'clock, he again appeared at the same office, and stated, in the presence of the manager and the secretary, that he was ready to pay the indebtedness. They then checked over his account, and found that he owed the company $3,907. For $107 of this he had given the company an order on another person, and the balance, or $3,800, he said he had accumulated, and was keeping at his house at Forest Dale, and told Mr. Hay to make out a receipt and "fetch it along" with him. Mr. Hay made out a receipt as requested, and then pinned it and a note, which the defendant had given the company as evidence of part of the indebtedness, together, and put them in his inside coat pocket on left side for delivery

by him to the defendant upon receiving payment of $3,800. The manager, being alarmed because of the defendant keeping so much money at his house, commanded him under no circumstances to pay over the money that night, not until the next morning, and instructed Mr. Hay not to call for or receive the same until in the morning. The defendant said he wanted to surprise them, and that was his reason for accumulating the money instead of paying the indebtedness in partial payments. The three then, it being nearly eight o'clock, left the office and went together up South Temple to West Temple street. Thence the manager continued on home, and Mr. Hay and the accused took the Calder's Park car for their homes at Forest Dale.

It appears from the testimony of the witness Morton, that after Mr. Romney, the manager, left them, the defendant arranged for Mr. Hay to come to his house and get the money that night. The deceased arrived at his home about 8:25 p. m., took supper, and then left. his house at 9:45, saying to his wife, "I am going over to Peter's [defendant] to collect some money. I will be back soon." At about 10:20 the wife and children retired. At 1 o'clock she awoke, and, finding her husband had not returned, became alarmed, and about three o'clock went to the house of the accused, aroused him, and inquired for her husband. She says he appeared very nervous and said her husband had "gone up to Ernest's" (meaning Mr. Romney), and told her that he supposed he missed the last car home and "stopped over with Ernest." The next morning, the 17th, about ten o'clock, the defendant called up Mr. Romney by telephone at the office of the lumber company, and wanted to know if he had seen Mr. Hay, and, upon receiving a reply in the negative, told him that Mr. Hay left his "place last night and had not been seen since." Upon being invited, the defendant then went to the company's office and told the witness Romney that Mr. Hay came to the defendant's house the night before for the money; that after trying to persuade him not to

take it at night, without avail, he paid the money over to "Mr. Hay in twenty-dollar gold pieces;" that, after Mr. Hay had checked the amount and distributed it in his different pockets, he accompanied him to the door, opened it, and, upon Mr. Hay passing out, shut it; and that that was the last he had seen or heard of him. On further inquiry the accused stated to the witness Romney that "he had been accumulating the money for some time; that he had been getting all his checks cashed into twenty-dollar gold pieces; and that he had kept it loose in the cellar on a beam or cross-wall." Mr. Romney and the accused then informed Mr. James Sharp, the father-in-law of the deceased, about the latter's disappearance, and related to Mr. Sharp the defendant's story, and then informed the police department, and repeated the same conversation, respecting Mr. Hay's getting the money and leaving, to the chief of police. In the presence of the accused, the circumstances were also explained to others as he had related them, and it seems some began to surmise that Mr. Hay had departed with the money after giving the defendant the receipt and note. Later in the day Mr. Sharp, Mr. Romney, the defendant, and others, went to the defendant's house at Forest Dale, and there, in his presence, upon inquiry by Mr. Sharp about them, the defendant's wife produced the receipt and note which Mr. Hay had taken with him from the lumber company's office. Then, upon being asked by Mr. Sharp, in the presence of a detective and others, to explain his transaction with Mr. Hay the night before, the defendant said that he had kept the money on top of the east wall in his cellar; that part of it was loose, and part in a sack; that he brought it up out of the cellar, some in his pockets and some in a sack; that Mr. Hay and he then sat down on a small settee and counted the money; and that Mr. Hay took part of it in his pockets and part in a sack, in all 190 $20 gold pieces, and then left the house, went down off the steps toward the south gate, but that he did not see him go out of the gate. After having stated the details of

the transaction, and after some persuasion by Mr. Sharp, who desired to know where the accused had last seen Mr. Hay, the defendant went to a spot, in a walk leading from the house, about 10 feet from the steps, and said there, as near as he could remember, was the last place he saw Mr. Hay. Mr. Sharp thereupon said to him, ''If that is the last place you 'saw my living son, that is the place where he was killed.'' Thereupon an occurrence took place between James Sharp and the defendant, as shown by the testimony of the former, as follows: ''I asked him to come again and show me where my son stood in the path, and he came with me and showed me again, and, when he put his foot there, I said, 'There is where you killed James R. Hay;' and he says, 'How do you know he is dead?' and I said, 'The proof to you will be that within twenty-four hours of the time we are speaking, and within a mile of the place where you put your foot, his dead body will be dug up in one of these fields.' '' To this accusation the defendant made no denial. In the afternoon of the same day suspicion began to point to him that he had killed Mr. Hay to obtain possession of the receipt and note. The next morning, December 18, 1901, while one Frank Torgersen was out looking for horses, he noticed in a field, west of defendant's house, and a short distance north of the railroad track—the Park City line, which at that place extends east and west—a little mound, and several spots of blood between it and the fence along the railway. Seeing this, Torgersen went to defendant's house and asked him for a shovel. The defendant gave him a short-handle, round-pointed one, and told him that was the only shovel he had, although later a long-handle, square-pointed shovel, which had the appearance of having been cleaned, was found in his barn, and the imprints about the mound had the appearance of having been made with a square-pointed shovel. Torgersen, upon returning to the mound with the shovel, discovered that a body had been buried there, and upon making known his discovery a number of persons, among

them the accused, went to the mound and exhumed the body of Mr. Hay. As the body was being taken out of the grave, a detective, standing by the side of the defendant, remarked that robbery was not the motive, as the gold watch was there, but received no reply from the accused. It was also noticed that the coat pocket on the left-hand side, into which Mr. Hay had put the receipt and note, on the evening of the 16th, at the lumber company's office, was pulled inside out. The body was then placed on a patrol wagon and taken in front of Hendry's store, where the wagon was stopped, and Mr. James Sharp and others appeared. While there, Mr. Sharp, who had on the day previous accused the prisoner of killing his son, in the presence of a number of people, looking at the defendant, who stood but a few feet from him, in front, and then at the dead, said: "He murdered you for a receipt that was on your body representing thirty-eight hundred dollars, and you never ran away, nor he never gave you a dollar." To this accusation the defendant made no reply, but dropped his head and looked on the ground. He was finally placed under arrest, and thereafter made various conflicting statements respecting the manner of keeping the $3,800 which he claimed he gave Mr. Hay on the night of the murder. Before his arrest he stated he had kept the money, part in a sack and part loose, on the east wall in his cellar. Afterwards, according to the testimony of the witness Penrose, the defendant, in answer to a question as to whether he kept the money in quart fruit jars, replied, "Yes, I had three jars full of twenty-dollar gold pieces." The same witness said he had told him on the day before that he had kept the money in a sack. The witness Sheets said the accused stated to him that he had three glass jars full of twenty-dollar gold pieces, and had kept them in the cellar. The witness Hilton stated that the defendant told him that he had the money he paid Mr. Hay in two glass jars in the basement on the wall. The witness Cummock testified that he said to him "he had had the money in the three

jars in the cellar, and some in one jar in the pantry.''

Several witnesses, it appears, examined the east wall of the cellar on the day after the homicide, and at the trial testified to the effect that on the top of the wall, where the defendant claimed to have kept the money, there was considerable dust, and that the dust was undisturbed. There were four openings for windows in the cellar, but the windows had not been put in, and the spaces were open. There is much other evidence in the transcript showing discrepancies in the accused's statements as to the money. The prosecution having produced a jar in evidence, produced $3,800 in $20 gold pieces and demonstrated that they did not make one jar full.

Respecting a conversation in regard to the payment of the money to Mr. Hay, the witness, Charles F. Watkins, brother-in-law of defendant, testified: ''I asked Peter if he could show that he had paid Mr. Hay the money. He said he could, but he says, 'My books are in such a shape that it will be necessary for me to represent that you have loaned me from a thousand to fifteen hundred dollars. I will be able to tell you and show you, after I am out of this trouble, that I had the money and paid Mr. Hay the money.' '' Upon being informed that the bank account of the witness would not permit such representations, the defendant said: ''You and Dick [meaning brother of witness] could fix it.'' This conversation occurred on the 19th of December. The same witness also testified that during the night of the 19th he slept at the defendant's house, and while there found $370 in a small box which was ''in the attic behind the chimney,'' and that on the next day, upon telling him that he found that money, the defendant ordered it to be given to his wife.

In addition to the testimony above quoted and referred to affecting the defendant's statements regarding the money and his transaction on the fatal night with the deceased, the prosecution introduced a vast

26 Utah 21

amount of evidence respecting the defendant's business transactions, his payment and receipt of moneys, and his bank accounts, for several months immediately preceding the night of the murder, which evidence, too voluminous to state here in detail, strongly tends to show the impossibility of the defendant having had in his house, on the night of the 16th, and paid the deceased, $3,800, and it seems to establish beyond all reasonable controversy the fact that the defendant's statements in that regard were untrue.

It is further shown in evidence that at about 9:30 o'clock on the night of the 16th a shot was fired, and heard from the direction of the grave, and the proof shows that after the body was exhumed, it was found that the deceased had been shot in the head "four inches back of the ear, and on a line with the ear, and beneath the scalp."

The witness Allen, who was the motorman on a street car that night, testified positively that at about 10:20 o'clock on the night of the 16th he observed, as his car was approaching the intersection of the street car track with the railroad track running east and west past the grave, a man walking west on the railroad track, in the direction of where the grave was afterwards found, and that when the car got within sixty or seventy feet of the man he recognized him as the defendant. The witness stated that he saw his face in the moonlight, and looked at him; that he was carrying a shovel; and that the defendant looked at the motorman.

The proof further shows that before the body was exhumed there was blood found on the railroad track opposite the grave, and there were also spots of blood leading from the railroad track to the grave.

On cross-examination counsel for the defendant elicited from the witness James Sharp the statement that the witness had received a revelation from God that the defendant had killed his son. The witness, upon being pressed by counsel, after stating that God had revealed it to him, said: "He told me, as proof to

Peter Mortensen, he had killed my son; he was the man that killed him; his dead body would be dug up within twenty-four hours within a mile of that place, buried in one of these fields."

The foregoing statement presents the character of the proof disclosed by the transcript.

After both sides rested, the jury were permitted to view the premises, in the absence of the defendant, he not desiring to be present. Thereafter the jury returned a verdict finding the defendant guilty of murder in the first degree, and upon sentence of death having been pronounced against him he appealed to this court, assigning various errors alleged to have been committed in the trial of the cause.

BARTCH, J., after a statement of the case as above, delivered the opinion of the court.

The appellant, in the first instance, insists that the court committed prejudicial error in permitting a stipulation, made in open court by the defense with the prosecution, wherein the defense admitted that, if the witness, J. C. Sharp, were present, he would testify that from November 2 to December 16, 1901, he had paid the defendant various specified sums of money amounting to $2,150, to be received as evidence and considered by the jury. It is urged that the admission as evidence of the matter set forth in the stipulation, notwithstanding the consent thereto by the defense, was in contravention of article 1, section 12, Constitution, which, *inter alia,* provides that in a criminal prosecution the accused shall have the right "to be confronted by the witnesses against him." To state the point made more precisely, it is that the prisoner had a constitutional right to be confronted by the witness, and that this right he could not waive. In general, the rights guaranteed to every accused person in a criminal action by the Constitution may be divided into two classes, those in which the public have an interest as well as the individual, and which are jurisdictional as

affecting the power of the court to try the cause; and those in the nature of privileges which are merely personal to the accused, for his benefit, and do not affect the general public. The former can not be waived, but the latter may be. Jurisdiction to try a case comes from the law. Consent can not confer it. For instance, consent can not waive the disqualification of the judge, nor impart jurisdiction where the law does not confer it. And the accused may, at any stage of the proceedings, raise the point that the court is without jurisdiction. This is a familiar doctrine. "Jurisdiction," says Mr. Bishop, "comes solely from the law; in no degree from the consent of litigants. So that neither consent nor anything else can authorize a court to act in a cause outside the sphere which the law has ordained for it. But where the subject-matter is within the cognizance of the tribunal, and the right to take jurisdiction of it in the particular instance depends on facts *in pais*—such as the residence of parties, and others within the like reason—consent will, in the absence of any special circumstance forbidding, establish the required fact, the same as would the verdict of a jury; so that, in such a case, there may be waiver." 1 Bish. New Crim. Proc., secs. 96, 123, 313. Where, however, the prisoner at the trial voluntarily consents, or sits by and fails to object, to any step taken in the proceedings which does not affect the jurisdiction of the court to try the cause, he will not thereafter be heard to complain because of it, although it may have been contrary to his constitutional rights. It is contrary to all ideas of fairness, as well as natural reason, for one to complain of that to the doing of which he voluntarily and knowingly gave his consent. This principle is recognized in law, and is analogous to the doctrine of estoppel. Whenever, therefore, a right, constitutional, statutory, or common-law, is merely personal to the accused, designed alone for his benefit, and does not amount to a jurisdictional limitation upon the power of the court, nor is of the essence of a valid conviction or

judgment, he may, in the absence of constitutional or statutory restraint, waive the right by giving his consent to a contrary step, or by failing to interpose an objection when he ought to do so. "Necessity is the chief foundation for this doctrine. Without it, a cause could rarely be kept from miscarrying. The mind, whether of the judge or the counsel, can not always be held taut like a bow about to send forth the arrow; and, if every step in a cause were open to objection as well after verdict or sentence as before, a shrewd practitioner could ordinarily so manage that a judgment against his client might be overthrown. Even by lying by and watching, if he did nothing to mislead, he would find something amiss to note and bring forward after the time to correct the error had passed. Should the pleadings be right, and only proper evidence be admitted, some question to a witness would appear in an objectionable form, or the judge would have dropped some word not absolutely square with the books, or omitted some explanation of law to the jury." 1 Bishop's New Crim. Proc., sec. 119.

Upon examination, it will be noticed that the right of the accused to be confronted by the witnesses against him, secured by the constitutional provision above referred to, falls within the class personal to the accused. It is a personal right, a personal privilege of which every defendant in a criminal proceeding may avail himself. It is limited to criminal prosecutions, and in no way affects the jurisdiction of the court to try the cause or to pass a valid judgment. Nor is the provision which secures to the accused the right in the nature of an inhibition upon a proceeding not authorized by law. Nor is it in the nature of a limitation restraining the court from exercising its power in a place or manner prohibited by law, or without its jurisdictional limits. It is not very unlike the right which every one accused of, and being prosecuted for, a crime, has to plead guilty and thereby waive the production of any evidence by the prosecution, and surely all agree that in such case,

where a plea of guilty is entered, a court of competent jurisdiction has power to pass judgment and authorize the penalties of the law to be executed. Nor is it much unlike a case where the prosecution makes application for the continuance of a criminal cause on the ground of absent witnesses. Here the accused may admit that such witnesses, if present, would testify to the statements set out by the prosecution, and consent to their use as evidence against him and thereby secure a speedy trial. In such event the accused consents to the use of the evidence without being confronted by the witnesses, and yet we know of no case where such action had in good faith, and not forbidden by express provision of law, was held to be in excess of the power of the court to permit. Such are simply instances, similar to the one at bar, where the accused waives his personal privilege to be confronted with the witnesses against him, and from them it seems apparent that in proper cases, where no harm can result to the accused, he may voluntarily waive his constitutional right of confrontation. The main reason for the confrontation of witnesses is to afford the accused an opportunity for cross-examination, and this is a privilege which he may waive. So when, at a trial, a prisoner sits by and permits inadmissible evidence to be received without objection, he can not afterwards complain of the action of the court in receiving it.

"If, except where some counter doctrine presses with a superior force forbidding, a party has requested or consented to any step taken in the proceedings, or if at the time for him to object thereto he did not, he can not afterwards complain of it, however contrary it was to his constitutional, statutory, or common-law rights." Bish., New Crim. Proc., sec. 118.

The Supreme Court of Iowa, in State v. Polson, 29 Iowa 133, construing a similar constitutional provision, said: "It will be observed that the right secured by this provision to the accused, to be confronted with the witnesses against him, is a personal right lim-

ited to proceedings in criminal prosecutions, or where the life or liberty of the citizen is involved. The proceeding is not in the nature of an inhibition upon a proceeding not in accord with the one secured. Neither is it in the nature of a jurisdictional limitation upon the authority of the court, prohibiting the exercise of power except in the manner specified. It secures simply a personal right, and in no manner affects the jurisdiction of the court when prosecutions are tried. It very clearly appears that this right in proper cases, where no wrong can be done the accused, may be by him voluntarily waived."

In State v. Albee. 61 N. H. 423, 60 Am. Rep. 325, it was said: "The benefit of statutory and constitutional provisions, both in civil and criminal jurisprudence, may be waived by a party interested. A person ought not to be heard to complain of that to which he has consented. For instance, he may not object to the grand jury after he has pleaded to the indictment, nor challenge a petit juror for a known cause after verdict, nor object after trial that a copy of the indictment was not furnished him when the statute requires it, nor that inadmissible evidence was received without objection, nor that the jury separated after verdict with his consent. These are familiar examples of the waiver of well-recognized provisions intended for the protection of a party. The cross-examination of a prisoner who volunteers himself as a witness is permissible, because, by electing to testify, he subjects himself to the scrutiny of a cross-examination, and consents to waive the constitutional provision that no subject shall be compelled to accuse or furnish evidence against himself."

So, in Williams v. State, 61 Wis. 281, 21 N. W. 56, it was said: "It is well settled that the accused may waive his right to be confronted with the witnesses on the trial."

In Perteet v. People, 70 Ill. 171, it was observed: "A prisoner, in a capital case, is not to be presumed to waive any of his rights; but that he may, by express

consent, admit them all away, can be neither doubted nor denied. He may certainly plead guilty, and thus deprive himself of one of the most valuable rights secured to the citizen, that of a trial by jury. If he can expressly admit away the whole case, then it follows that he can admit away a part of it, but he will not be presumed to have done so. The consent must be expressly shown." 28 Am. and Eng. Ency. Law, 590; 1 Bish. Cr. Proc., secs. 117, 120; 1 Bish. Cr. Law, secs. 995, 996; 1 Greenl. Ev., sec. 163f; State v. Wagner, 78 Mo. 644, 47 Am. Rep. 131; Hancock v. State, 14 Tex. App. 392; Shular v. State, 105 Ind. 289, 4 N. E. 870, 55 Am. Rep. 211; State v. Adams, 20 Kan. 311; Bulliner v. People, 95 Ill. 394; State v. Arbuno, 105 La. 719, 30 South. 163; Connors v. People, 50 N. Y. 240; McKinney v. People, 2 Gilman 540, 43 Am. Dec. 65; Hurley v. State, 29 Ark. 17; United States v. Sacramento, 2 Mont. 239, 25 Am. Rep. 742.

The defendant in the case at bar could not only waive his right, as we have seen, to be confronted with the witness, but it is difficult to see how the statements admitted as evidence could have been prejudicial to him.

The prosecution endeavored to show, by his receipts and expenditures during a certain period of time previous and up to the night of the murder, that the defendant had not the money, and could not and did not pay the $3,800 to Mr. Hay, as he had claimed. Such having been the theory of the prosecution, how could he be prejudiced by a stipulation which showed that just prior to the time of the homicide he had received $2,150 from one person? Clearly such evidence was advantageous to the defense, and, if the accused could have shown that his receipts were $3,800 in excess of his expenditures, it would have been a strong circumstance in favor of innocence. It is thus evident that no harm resulted to the prisoner because of his waiver of his constitutional right, and that such waiver constitutes no ground for complaint.

Equally unfounded is the appellant's claim that the court erred in receiving the testimony of the witness Sinclair respecting the amount of money received by the Utah National Bank to defendant's credit, and the amount drawn out by him through his checks on the bank.

The appellant also complains of the action of the court in admitting in evidence that portion of the testimony of the witness James Sharp relating to certain statements and declarations made by the witness over the dead body of his son-in-law while the body was lying in the patrol wagon in front of Hendry's store at Forest Dale. The statements constituting the ground of the objection are as follows: "He murdered you for a receipt that was on your body representing thirty-eight hundred dollars, and you never ran away, nor he never gave you a dollar." Answering questions as to what the defendant said and did in reply, the witness stated: "He didn't say anything but hung his head and looked on the ground."

It appears, when these statements were made, the witness stood on the step at the rear end of the wagon and looked at the dead, and then at the defendant, who was standing at the right-hand side of the vehicle about six or eight feet from the speaker. There was quite a crowd of people there looking on. Counsel insist that there is nothing to show that the defendant was listening to or heard, or was in a position to hear, the accusations, but when the solemnity of the occasion is considered, and the fact that the defendant stood by the side of the wagon, in front, and but a few feet from his accuser, and that, as is indicated by the evidence, stillness pervaded the entire crowd, and when it is further considered that, upon the accusation made, he dropped his head and looked on the ground, and that on the day previous, as shown by the proof, the same person had openly accused him of the murder, receiving in reply but the query how the accuser knew his son-in-law was dead, there is no room for any doubt that the accused

both listened and heard. It is idle to say that, under such circumstances, he was not aware of what was going on. He stood there, on that solemn occasion, in the very presence of the dead, his friends and neighbors by his side, and permitted the accusation that he was the murderer to be made against him publicly without a denial, and yet, a man of affairs, he must have known that silence under such circumstances would be taken as indicative of guilt. It does seem, when we consider the condemnation and abhorrence with which the commission of such an atrocious crime is received by mankind, that an innocent man would resent such an accusation, so made as was this one, with all the power of his nature. It will not do to say that the defendant was not called upon to speak or answer under the circumstances disclosed by this record. The accusation branded him as a criminal, and if he was innocent he ought to have resented it. What took place there was of a most material character in its bearings upon the offense and the accused, and we perceive nothing in the record, nor do we know of any rule of evidence, which, under the circumstances, prevented the prosecution from introducing proof of what was said and done. It was the duty of the defendant to speak, and his failure to do so was a circumstance which the jury had a right to consider, with all the other evidence, in determining the question of his guilt or innocence. The statements of accusation were made in ordinary language in his immediate presence, within his hearing, and their truth was within his knowledge. They were of such a character and made under such circumstances as naturally called for a denial if they were not true. The testimony relating to the statements was therefore admissible.

Mr. Underhill, in his work on Criminal Evidence, sec. 122, says: "The silence of the accused as regards statements in his hearing which implicate him directly or indirectly may be proved with the statements, and from his acquiescence the jury may infer his guilt. Silence is assent as well as consent, and may, where a

direct and specific accusation of crime is made, be regarded under some circumstances as a *quasi* confession. An innocent person will at once naturally repel an accusation of crime as a matter of self-preservation and self-defense, and as a precaution against prejudicing himself. A person's silence, therefore, particularly when persistent, will justify an inference that he is not wholly innocent. . . . For silence to be equivalent to a confession, it must be shown that the accused heard and understood the specific charge against him, and that he heard it under circumstances not only permitting but calling for a denial, taking into consideration the circumstances and the persons who were present."

In Greenleaf on Evidence, sec. 197, the law is stated thus: "Admissions may also be implied from the acquiescence of the party. But acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. And, whether it is acquiescence in the conduct or in the language of others, it must plainly appear that such conduct was fully known, or the language fully understood by the party, before any inference can be drawn from his passiveness or silence. The circumstances, too, must be not only such as afforded him an opportunity to act or to speak, but such also as would properly and naturally call for some action or reply from men similarly situated."

In Kelley v. People, 55 N. Y. 565, 14 Am. Rep. 342, Mr. Justice Allen said: "When an individual is charged with an offense, or declarations are made, in his presence and hearing, touching or affecting his guilt or innocence of an alleged crime, and he remains silent when it would be proper for him to speak, it is the province of a jury to interpret such silence, and determine whether his silence was, under the circumstances, excused or explained. . . . Any declaration of the individual in response to a statement so made would be admissible in evidence, and an omission to make an answer to it or notice it, like other acts of the party,

is to be interpreted, and such effect given to it as evidence, in connection with the other circumstances of the case, as the jury in their discretion shall think it entitled to. The implication of assent to a statement affecting the guilt or innocence of an individual, from an omission to controvert, qualify, or explain it, arises from the fact that a person knowing the truth or falsity of a statement affecting his rights, made by another in his presence, will naturally, under circumstances calling for a reply, deny it, if he be at liberty to do so, if he does not intend to admit it."

So, in Sparf v. United States, 156 U. S. 51, 15 Sup. Ct. 273, 39 L. Ed. 343, Mr. Justice Harlan, delivering the opinion of the court, said: "The declarations of Hansen after the killing, as detailed by Green and Larsen, were also admissible in evidence against Sparf, because they appear to have been made in his presence, and under such circumstances as would warrant the inference that he would naturally have contradicted them if he did not assent to their truth." 2 Whart., Ev., sec. 1136; 1 Taylor, Ev., sec. 809; 9 Am. and Eng. Ency. Law (1 Ed.), 338; 1 Am. and Eng. Ency. Law (2 Ed.), 671-674; 6 Am. and Eng. Ency. Law (2 Ed.), 557; Pierce v. Goldsberry, 35 Ind. 317; State v. Burton, 94 N. C. 947; Com. v. Brailey, 134 Mass. 527; McKee v. People, 36 N. Y. 113; State v. Cleaves, 59 Me. 298, 8 Am. Rep. 422; State v. Reed, 62 Me. 129; Loggins v. State, 8 Tex. App. 434.

For like reasons the court properly admitted the testimony of the witness Penrose, which was corroborative of that of the witness Sharp, and relates to what took place at the time of the accusation. Nor do we think that the court erred in admitting the testimony of the witness Dr. Mayo relating to the probable length of time which intervened from the time the deceased had eaten his supper until his death, as indicated by the appearance of the contents of the stomach and the stage of digestion, the witness, as an expert,

having made an examination of the stomach of the deceased.

The appellant also complains of the action of the court in permitting, over the objection of the defense, the wife of the deceased to testify that after supper, on the night of the homicide, as her husband was leaving the house, he closed the door and said to her: ''I am going over to Peter's [defendant's] for a few minutes to collect some money. I will be back soon.'' The principal objections to the admission of this testimony urged are that the defendant was not present when the statements were made, and that it is hearsay evidence, and not a part of the res gestae. These objections are not sound. The fact that the defendant was not present when the declarations testified to were made is wholly immaterial, and the statements are not merely hearsay evidence. They are declarations of the intention and purpose of the deceased to meet the defendant, and were admissible, as original evidence, under one of the exceptions to the rule of hearsay. Some courts admit such declarations as a part of the res gestae, but we think they more properly come under the exceptions to the rule of hearsay evidence. Greenl., Ev., sec. 162a. The evidence of these declarations was not admitted for the purpose of showing that the deceased was actually at the house of the defendant, but to show what was in his mind—what his intentions were—at the time of utterance. Evidence of what a person's intentions were is relevant circumstantially to show that he afterwards carried out his designs.

In Sugden v. Lord St. Leonards, L. E. 1 P. D. 154, Mellish, L. J., said: ''Whenever it is material to prove the state of a person's mind, or what was passing in it, and what were his intentions, there you may prove what he said, because that is the only means by which you can find out what his intentions were.''

These declarations, as appears, were made in a natural way, and not under circumstances of suspicion,

and therefore proof of them was admissible not only to show the intentions of the deceased, but also as showing the intention of his going to the house of the defendant for a legitimate purpose.

In 1 Greenl., Ev., sec. 162c, the author, speaking of exceptions to the hearsay rule, says: "The existence of a person's design or plan to do a thing is relevant circumstantially to show that he ultimately did it. The presence of the design or plan may be evidenced circumstantially by conduct; but the person's assertion of a present design or plan, when made in a natural way and not under circumstances of suspicion, is admissible under the present exception. The *res gestae* notion is often put forward, but improperly, as the justification of this; for the reason already explained, such statements must be regarded as admissible by virtue of the present exception. They are generally treated as admissible; though a few courts are found to exclude them, usually through a misapplication of the *res gestae* principle."

In Commonwealth v. Trefethen, 157 Mass. 180, 31 N. E. 961, 24 L. R. A. 235, where the declarations of the deceased, and in controversy, were made on the day previous to the death, Mr. Chief Justice Field, in the course of an exhaustive discussion of the subject, said: "Although evidence of the conscious voluntary declarations of a person, as indications of the state of mind, has in it some of the elements of hearsay, yet it closely resembles evidence of the natural expression of feeling, which has always been regarded in the law, not as hearsay, but as original evidence (1 Greenl., Ev., sec. 102); and when the person making the declaration is dead, such evidence is often not only the best, but the only evidence of what was in his mind at the time. On principle, therefore, we think it clear that, when evidence of the declarations of a person is introduced solely for the purpose of showing what the state of mind or intention of that person was at the time the declarations were made, the declarations are to be regarded as

acts from which the state of mind or intention may be inferred in the same manner as from the appearance of the person, or his behavior, or his actions generally. In the present case the declaration, evidence of which was offered, contained nothing in the nature of narrative, and was significant only as showing the state of mind or intention of the deceased.''

So, in State v. Hayward, 62 Minn. 474, 65 N. W. 63, Mrs. Hazleton, a witness for the state, testified that she saw Miss Ging, the deceased, at a certain store on the day of the murder; that, as they were parting, witness asked her to go home with her to dinner; and that Miss Ging answered she could not—that ''she had a business engagement with Mr. Hayward.'' The witness further testified that Miss Ging, answering a question as to who Hayward was, said, ''He is a friend of mine.'' The declarations, it appears, were made about two hours previous to the homicide, not in the presence of the defendant, and the Supreme Court held the testimony competent evidence against the prisoner in connection with the other evidence in the case. Mr. Chief Justice Start, respecting this point, said: ''The evidence of the witness Mrs. Hazleton, to the effect that Miss Ging stated to the witness some two hours before her murder that she had a business engagement that evening with the defendant, was not admissible, in my opinion, on the ground that it tended to 'characterize her subsequent acts and her departure on the fatal ride soon after she made the statement'—that is, that it was a part of the res gestae—for the reason that her statement neither accompanied nor characterized any act relevant to the issue. But it was relevant to the issue to show that she did meet the defendant, and evidence of her declarations of an intention and purpose to meet him was admissible as original evidence to prove that she did in fact intend to meet him—a fact which tended directly to corroborate the previous testimony of Blixt that she did meet the defendant; for, if she had formed the previous purpose to meet him, the proof of such purpose rendered the

evidence of Blixt that she did meet him reasonable and probable. This evidence clearly falls within the rule that, when the question is whether a person did a certain act, his declarations, oral or written, made prior to and about the time he is alleged to have done an act, to the effect that he intended to do it, are admissible as original evidence, if made under circumstances precluding any suspicion of misrepresentation.''

In Hunter v. State, 40 N. J. Law 495, where Hunter was charged with the murder of Armstrong, the Court of Errors and Appeals unanimously held that Armstrong's oral statements to his son, and the note he had written to his wife a few hours before leaving home on the night of the murder, to the effect that he was going with Hunter to Camden on business, were properly admitted in evidence. Mr. Chief Justice Beasley said: ''After mature reflection and a careful examination of the authorities, my conclusion is that these communications of the deceased should be regarded as constituent of that transaction, for I think they were preparations for it, and thus were naturally connected with it. In the ordinary course of things it was the usual information that a man about leaving home would communicate for the convenience of his family, the information of his friends, or the regulation of his business. At the time it was given such declarations could, in the nature of things, mean harm to no one; he who uttered them was bent on no expedition of mischief or wrong; and the attitude of affairs at the time entirely explodes the idea that such utterances were intended to serve any purpose but that for which they were obviously designed.''

Likewise in Mutual L. Ins. Co. v. Hillmon, 145 U. S. 285, 12 Sup. Ct. 909, 36 L. Ed. 706, where the admissibility of certain letters which had been written by the deceased was under consideration, Mr. Justice Gray said: ''A man's state of mind or feeling can only be manifested to others by countenance, attitude, or gesture, or by sounds or words, spoken or written. The nature of the fact to be proved is the same, and evidence

of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen. When the intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of declarations of the intention. But whenever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party. . . . The letters in question were competent, not as narratives of facts communicated to the writer by others, nor yet as proof that he actually went away from Wichita, but as evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go, and that he went with Hillmon, than if there had been no proof of such intention." 1 Greenl., Ev., secs. 14k, 100, 101, 110, 162b, 162d; Gillett, Ind. Col., Ev., secs. 277-279; Railway Co. v. Herrick, 49 Ohio St. 25, 29 N. E. 1052; State v. Dickinson, 41 Wis. 299; State v. Jones, 64 Iowa 349, 17 N. W. 911, 20 N. W. 470; Carroll v. State, 22 Tenn. 315; Territory v. Couk, 2 Dak. 188, 47 N. W. 395; D. & R. G. R. R. Co. v. Spencer, 25 Colo. 9, 52 Pac. 211; Cluverius v. Commonwealth, 81 Va. 787; Insurance Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437.

We are of the opinion that the testimony herein questioned was rightfully admitted.

At the trial, upon the conclusion of the evidence, the attorney for the State requested the court to direct the jury to view the premises where the homicide was committed. Thereupon the court asked the defense if there was any objection, and received the reply from counsel for the defendant that there was none, and, upon further inquiry, the court was informed that the defense did not desire the defendant to accompany the jury in the view of the premises. The court thereupon appointed an officer, and, after such officer was duly sworn, instructed him and the jury quite fully

as to their respective duties, and then permitted the jury to make the view in charge of the officer. After the return of the jury from the scene of the homicide, the court was informed that some of the jurors, while on the premises, stepped off some distances between points about defendant's house which had been testified to in the case, and, being in doubt as to whether the defendant ought not to have been present at the view, informed the defense of what had been done, and offered to direct another view to have the accused present, but counsel for the defense again informed the court that they did not desire to have the jury return to view the premises with the defendant, and had no objections to what had been done by the jurors as reported.

Notwithstanding this position of the defense before the trial court respecting the view in the absence of the defendant, the same counsel now contend in this court that under our statute the trial court, in permitting and directing the jury to view the premises where the homicide occurred, without the presence of the defendant and court, deprived the defendant of his constitutional rights. This, it is urged, was taking evidence in the absence of the defendant, and deprived him of the right of confrontation. If it were conceded that the view of the premises by the jury were the taking of testimony upon the trial, there might be some controlling force in the position of the defense; but we are unable to concede that the view was either a part of the trial or the taking of evidence, within the contemplation of the Constitution or the statute. The contention is founded upon article 1, section 12, Constitution, which, so far as material here, provides that, "in criminal prosecutions the accused shall have the right to appear and defend in person and by counsel," and "to be confronted by the witnesses against him," and "to have a speedy public trial by an impartial jury."

We have already seen herein that in proper instances the accused can waive his right to be confronted by a witness or witnesses. Now, the term "trial" was

evidently employed in this provision in the sense in which it has from time immemorial been commonly understood in legal parlance, that is, to refer to and mean a proceeding conducted in the place provided for the court to be held, and before a tribunal consisting of the judge or judges, as the case may be, the clerk, the jury—where one is required—and other proper officers, all of whom together constitute the court. There is nothing in the context to indicate that the term refers to a proceeding to be conducted partly in the place provided for holding court and partly in some other place which might be suggested by the evidence. It seems clear, therefore, that unless the view as authorized by the statute, and which was had in the absence of the defendant and court, was, or must be regarded as, the taking of evidence and a part of the trial, it was not inhibited by the Constitution, for, if it was not a part of the trial, then the presence of the court and defendant at the view was not a necessity. If it was a part of the trial, it was also violative of section 4811, Revised Statutes, which provides that, if the prosecution is for a felony, the defendant must be personally present at the trial. The statute, section 4870, Revised Statutes, which authorizes the view, provides: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of the officer, to the place which must be shown to them by a person appointed by the court for that purpose; and the officer must be sworn to suffer no person to speak or communicate with the jury, nor do so himself on any subject connected with the trial and to return them into court without unnecessary delay, or at a specified time." It must be conceded that the appellant's contention has some support in the authorities.

In Whart. Cr. Pl. and Pr. sec. 707, with reference to the view of the premises, it is said: "The visit, also,

must be made under the supervision of officers appointed by the court, duly sworn, and in the presence of the accused, who is entitled to have all evidence received by the jury taken in his presence, though a refusal to attend by the defendant, he being duly requested and empowered to do so, may not vitiate the proceedings.''

Here, as will be noticed, while the eminent author states that the view must be had in the presence of the defendant, and intimates that it is taking evidence, he admits that where, as in the case at bar, the defendant has had the opportunity to be present and refused to avail himself of it, his absence "may not vitiate the proceedings."

This contention also finds support in some of the adjudicated cases. In Bostock v. State, 61 Ga. 635, the view seems to have been regarded as an extraordinary proceeding, and it was held error in the trial court to inquire of the defendant's counsel whether he objected to the jury's examining the premises, and, upon receiving a negative answer, sending them in charge of officers to look at the scene of the homicide. This case, respecting the view and inquiry of the court as to the desire of the defendant to be present, seems to be quite on a parallel with the present instance, and is in point. So there are several California cases which give some support to the appellant's theory, viz.: People v. Bush, 68 Cal. 623, 10 Pac. 169; People v. Lowrey, 70 Cal. 193, 11 Pac. 605; and People v. Yut Ling, 74 Cal. 659, 16 Pac. 489. Of these hereafter. Likewise, Benton v. State, 30 Ark. 328, is in point for the appellant.

Notwithstanding these, and probably a few other cases, we are unable to agree that the view is taking evidence at the trial, in the sense in which the term "trial" is used in the Constitution, or that the presence of the accused at the view is essential, under our statute, although we doubt not that in every such case the prisoner should be afforded, as he was in this

instance, an opportunity to be present at the view, if such be his desire.

It will be observed that, by the terms of the statutory provision above quoted, the granting of the view is left to the sound discretion of the trial court. Neither the presence nor absence of the accused is made a requirement. Nor is there anything said respecting the presence or absence of the judge, or of any of the officers of the court, except the officer who is to be sworn, and in whose custody the jury is to be conducted to the place of the offense, or in which any other material fact occurred, and kept from communication in any form with other persons. There is nothing whatever said in the provision about the taking of testimony, nor about any temporary or other transferring of the place of trial or records of the court, to the scene of the crime or other place; and, whether the accused be present at or absent from the view, he is still in the eye of the law regarded as present during the trial. It is the same as when the jury retires from the immediate presence of the court for any other proper cause, as when it retires to deliberate upon the verdict, which all agree it may do in the absence of the prisoner. The jury is "to be conducted in a body" to the place of view by a sworn officer, and by him returned "into court without unnecessary delay." "This," as said by Mr. Justice Brewer, construing a similar provision of statute, "means that the place of trial is unchanged and that the jury, and the jury only, are temporarily removed therefrom. ..Just as when the case is finally submitted to the jury, and they 'retire for deliberation,' there is simply a temporary removal of the jury. The place of trial is unchanged. And whether the jury retire to the next room, or are taken to a building many blocks away, the effect is the same. In contemplation of law the place of trial is not changed. The judge, the clerk, the officers, the records, the parties, and all that go to make up the organization of the court, remain in the court room. The jury retire to discharge one duty connected with

the trial, and yet, though absent while discharging that duty, inasmuch as it is done under the direction of the court, and while in charge of an officer appointed by the court, they are in legal contemplation in the presence of the court. Though the defendant may not go with them into their place of retirement, he is nevertheless personally present during that portion as well as the rest of the trial." State v. Adams, 20 Kan. 311.

Nor does this provision of the statute conflict with section 4811, Revised Statutes, which provides that the accused must be personally present at the trial. **8** This does not mean that the defendant must all the time be in the actual presence of the jury, but rather that he must be at the trial in court and in its presence. The court is the real thing, fixed and permanent. The jury is but a temporary adjunct for a partial purpose of the trial. For the defendant, then, to be personally present at the trial, he must be in the presence of the court, and thus the two sections are not repugnant to each other. Nor is such a view as is authorized by the statute, and, as the one had in this case, where the **9** prisoner had an opportunity to be present, inhibited by the Constitution. The provisions in that instrument which guaranty the accused, in a criminal action, the right to "appear and defend in person and by counsel," and "to be confronted by the witnesses against him," were designed to protect every person accused of crime against judgment of condemnation without a hearing in open court, or by secret trial. The latter provision has reference to the persons or individuals who may testify against the accused, and not to inanimate objects, although they be objects which, when viewed in the light of the testimony of living witnesses, may give rise to inferences and make human understanding more clear and perfect. The statute which authorizes the view was doubtless designed to aid such understanding, through the power of perception and of comparison, that is, by giving the jury an opportunity to compare the objects,

which the testimony had pictured in their minds, with the real things, as they might perceive them upon the premises, and thus to enable the jurors to draw just and proper inferences from the testimony of the witnesses. Suppose an offense were committed at the very threshold of the courthouse, the place fixed for the trial of persons accused of crime, would counsel seriously undertake to maintain that the perpetrator could not be tried there for the sole reason that the jury, in being conducted to and fro, would observe the scene of the offense, and that this would be taking evidence in the absence of the court and defendant? Would counsel be heard to base his objection to a trial upon such ground? Yet the effect, upon the jurors, would in all probability be greater, because of their frequent vision, than would a view of the scene of the offense had it occurred at some distance from the place of the forum. To illustrate further, suppose an offense were committed in a public place, as frequently happens, with which the inhabitants of the county generally are familiar, would, after trial and conviction of the perpetrator, a motion in arrest of judgment, based upon the sole ground that jurors had observed before the trial, and were familiar with, the scene of the crime, prevail? We are aware of no case where a court has so ruled. And yet if the view at the time of the trial is taking evidence, within the intent of the Constitution, and therefore objectionable, why are not the observations made before the trial by persons who are afterwards selected as jurors likewise objectionable? Whether the jurors become familiar with the scene of crime by a view at the time of the trial, or whether they were already familiar with such scene, the effect upon the mind must be the same. In either case the knowledge of the locality is likely to operate upon their minds in precisely the same manner in determining the weight and effect to be given to the testimony. If perception of inanimate objects out of court is taking evidence, within the meaning of the Constitution, then it follows logically that every person who,

through observation, is familiar with the locality of a crime, is susceptible to the charge of having taken evidence in the absence of the perpetrator, and is incompetent as a juror in the prosecution of the offense. Such are some of the unwarranted results which would naturally and logically follow if the appellant's contention were upheld. While the constitutional safeguards designed for the protection of those accused of crime should be cautiously preserved and justly applied, still they should not, by judicial construction, be turned into a means to prevent the discovery of the truth, and the punishment of the guilty, to the hazard of the lawabiding citizens.

The view, therefore, cannot be construed as designed for the purpose of taking testimony, within the meaning of the Constitution, but for the sole object of enabling the jurors the better and more fully to appreciate, and the more accurately to understand, weigh, and apply the statements of persons who testified before them as witnesses. And the interpretation, thus herein adopted and applied, does no violence to the right of the accused to be present at the trial, nor to his right of confrontation, and, in our judgment, is in consonance with the sounder reason and the weight of authority.

Mr. Greenleaf, in his admirable work on the Law of Evidence, in volume 1, section 1620, subdivision 4, observed: "Does the hearsay rule—i. e., as involving the right of cross-examination, and incidentally of confrontation, of witnesses—require that in criminal cases (where the Constitution secures the right, and therefore overrides any statutes regulating views) the defendant should be present at a view? The requirement of confrontation implies merely that the party shall have the opportunity of cross-examining witnesses, and a view by the jury is not the consultation of witnesses, but merely the inspection of the thing itself which is the subject of the controversy; so that the constitutional principle cannot properly apply to render improper a view at which the accused is not present. This is the

result reached by the better judicial opinion; but there are courts which take the contrary view."

In Hughes, Cr. L. and Proc., sec. 3203, the author says: "The court may in its discretion permit the jury to visit and view the premises where it is alleged a crime was committed, not for the purpose of furnishing evidence upon which a verdict is to be found, but for the purpose of enabling the jury better to understand and apply the evidence which is given in court."

In Commonwealth v. Van Horn, 188 Pa. 143, 41 Atl. 469, where the jury were permitted to view the premises of the homicide in the absence of the defendant, it was said: "No right of the defendant was in any degree impaired or affected by the mere fact of the view. It served to make the testimony more intelligible to the jury, but that is not impairing a constitutional right in any conceivable sense."

So, in State v. Reed, 35 Pac. 706, the Supreme Court of Idaho, speaking through Mr. Chief Justice Huston, said: "We have examined with much care the cases cited by counsel upon this question, both in their briefs and on the argument, and we are constrained to hold that the weight of reason and authority are against the contention of appellant. While we think it advisable in all such cases to permit the defendant to be present at such view if he so desires, we think, where neither the defendant nor his counsel expressed such desire, and where the view was had on motion of defendant, and the record does not disclose that anything improper, or that can be construed as prejudicial to the defendant, took place at or during the view, no such error has been committed as would justify a reversal."

In People v. Thorn, 156 N. Y. 286, 50 N. E. 947, 42 L. R. A. 368, it was observed: "It appears to us that the more rational and reasonable construction to be given to the provisions of the section is that the view is not the taking of testimony within the meaning of the Bill of Rights, but that the sole purpose and object of the view is to enable the jurors to more accurately un-

derstand and more fully appreciate the testimony of witnesses given before them.''

Likewise, in Shular v. State, 105 Ind. 289, 4 N. E. 870, 55 Am. Rep. 211, where a similar statute was construed, it was said: ''It cannot be seriously doubted that evidence can only be delivered to a jury in a criminal case in open court, and, unless there is a judge or judges present, there can be no court. The statute does not intend that the judge shall accompany the jury on a tour of inspection; this is so obvious that discussion could not make it more plain. The jury are not, the statute commands, to be spoken to by any one save by the officer and the person appointed by the court, and they are forbidden to talk upon the subject of the trial. It is the duty of the jurors to view the premises, not to receive evidence, and nothing could be done by the defendant, or by his counsel, if they were present, so that their presence could not benefit him in any way, nor their absence prejudice him.''

It seems the law is the same in England. In Queen v. Martin, L. R. 1 C. C. R. 378, where the jury were permitted to view the premises after the court had summed up the case, it was observed: ''We are unanimously of opinion that there was no irregularity in allowing such a view. It is always in the discretion of the court to allow a view or not, though such precautions as may seem to the court necessary ought to be taken to secure that the jury shall not improperly receive evidence out of court.'' 1 Greenl. Ev., secs. 13, 13a; Gillett, Ind. Col. Ev., sec. 86; State v. Chee Gong, 17 Or. 635, 21 Pac. 882; Commonwealth v. Webster, 5 Cush. 295, 52 Am. Dec. 711; Close v. Samm, 27 Iowa 503; People v. Johnson, 110 N. Y. 134, 17 N. E. 684; State v. Ah Lee, 8 Or. 214; Chute v. State, 19 Minn. 271 (Gil. 230); Sasse v. State, 68 Wis. 530, 32 N. W. 849; State v. Hartley, 22 Nev. 342, 40 Pac. 372, 28 L. R. A. 33; State v. Buzzell, 59 N. H. 65; Com. v. Salyards, 158 Pa. 501, 27 Atl. 993; People v. Hull, 86 Mich. 449, 49 N. W. 288; Com. v. Knapp, 9 Pick. 496, 20 Am. Dec.

491; Heady v. Vevay, Mt. S. & V. T. Co., 52 Ind. 117; State v. Moran, 15 Or. 262, 14 Pac. 419; Com. v. Miller, 139 Pa. 77, 21 Atl. 138, 23 Am. St. Rep. 170; City of Indianapolis v. Scott, 72 Ind. 196.

That the accused, in every such case where a view is permitted by the court, should have an opportunity to be present, we entertain no doubt, but when he has had such opportunity and has declined it, or indicated a desire not to be present, then his mere absence cannot avail him, after verdict, to reverse the judgment. Nor, after such opportunity granted and a refusal thereof, do we deem it proper for a court to compel the presence of the prisoner, against his will, at the view of the premises. To compel him to be present against his will would be an arbitrary action unwarranted under the law. This, whether such view be regarded, as contended for by the appellant herein, as the taking of testimony, or as a means for the better understanding and application of the testimony of the witness given in open court before the jury; for surely, if the mere view of inanimate objects is the taking of testimony, then, a fortiori, is the viewing of the accused, the living object, upon the scene of the crime, where his recollections and the pangs of remorse, if he is guilty, are so likely to reflect his guilt upon his countenance, and manifest it in his actions, not only the taking of testimony, but compelling him to give testimony against himself, which clearly contravenes his constitutional rights to the effect that an accused can refuse to testify against himself, and rest secure in the fact that the burden is upon the prosecution to prove him guilty without any aid from him as a witness.

If the view be regarded, as indicated by the weight of authority, as a means to enable the jury to apply the evidence more accurately and understandingly through the impression which the objects viewed make upon the jurors, then the impression which the accused, confronted with the scene of the crime, would naturally make upon them, might be detrimental to him; and such

might be the effect even as to one innocent of the crime charged, for the mere fact of being accused of a heinous offense might, in the presence of the scene of the crime, induce actions and conduct that might convey the impression of guilt, especially to untutored minds. The very thought of such an accusation may be sufficient to unnerve a sensitive nature, and make the individual, though entirely innocent, appear as though steeped in guilt. Thus, upon reflection, is a court warranted peremptorily to require a defendant in a criminal action to be present, against his will, at such a view? We think not. Under either theory respecting the view, the constitutional rights and justice to the accused alike seem to forbid the exercise of such power against the will of the prisoner. Can, then, a view of the inanimate objects at the scene of the crime be prevented by the mere refusal of the accused to be present. We are of the opinion that it cannot, and that if the accused be afforded an opportunity to be present, and he declines it, the view may be lawfully had in his absence.

It seems clear, upon reason and authority, that such a view, in a criminal case, does not impair the defendant's constitutional rights. The counsel for the prisoner in this instance, however, insist that our statute granting the view was borrowed from California; that the Legislature of this State adopted it with the construction of that State placed upon it; and that the Supreme Court of California, before the adoption of the statute here, had construed it as contended for by the appellant. It is true that our statute is the same as that of California, and that, in the cases hereinbefore cited from that State, the enactment, before its adoption here, was construed adversely to the construction we are now placing upon it; but, notwithstanding we concede such to be the fact, and notwithstanding the high regard we entertain for the decisions of the Supreme Court of California, we are unable to concur in the interpretation of those cases, or the reasoning on this subject therein contained, because, in our judgment,

they are not only opposed to the decided weight of authority, but also to the better reason. We are aware of the rule, generally followed, that, where the Legislature adopts a statute from a sister State, it adopts it with the interpretation which that State has placed upon it. That rule, however, is not absolutely conclusive upon the courts of the State adopting the statute. This court has so held in Coulam v. Doull, 4 Utah 267, 277, 9 Pac. 568. Mr. Justice POWERS, speaking for the court, said: ''This rule is not absolute. The statute as we have seen, was construed by Massachusetts and Iowa before it was adopted in California, and the California decision seems to us to be opposed to the weight of authority and of sound reason, and to be a departure from the prevailing interpretation.'' Coulam v. Doull, 133 U. S. 216, 10 Sup. Ct. 253, 33 L. Ed. 596; Dixon v. Ricketts, 26 Utah 215, 72 Pac. 947; Matthews v. Jensen, 21 Utah 207, 61 Pac. 303.

Nor in this case, so far as shown by the record, do we think there was misconduct on the part of the jurors, at the time of the view, which vitiated their verdict. At the trial, on cross-examination, counsel for the appellant persistently interrogated one of the witnesses for the prosecution about a certain revelation which, it seems was understood, the witness claimed to have had from God, respecting the murder, and the perpetration of it, by the accused. The record shows a deliberate determination on the part of the defense to have the witness state the details of what he claimed had been revealed to him from supernatural sources, although there were no inquiries made respecting such revelation by the prosecution in the examination in chief. After they had thus knowingly, deliberately, and evidently designedly, elicited such testimony upon cross-examination, the counsel for the prisoner, both sides having rested, requested the court to charge the jury that, in considering the evidence in the case, they should not take any statements as to a revelation into consideration, and that such statements should be

"considered only in determining the credibility of the witness." The court refused to instruct specially in the language requested, but charged the jury generally and quite fully in regard to their duties respecting all the evidence introduced upon the trial. The appellant, through the same counsel, now complains of the admission of this testimony and of the refusal to charge in the language requested, and insists that the court ought to have stricken out all such evidence on its own motion. This, indeed, is a bold attempt to shift the responsibility for the introduction of what the appellant now claims to be improper evidence upon the court. It is a case unique, it seems, in criminal procedure, where the defendant seeks a reversal of a judgment against him because of testimony which he himself brought into the record, and this, as appears, by insisting upon answers to numerous and repeated questions, which the witness seemed unwilling to make. Whether or not the testimony in question, viewed in the light of the other facts in evidence, was inadmissible, it is not necessary to determine. It is sufficient to say that such practice on the part of the defense, in the trial of an action, can not be upheld. If permitted, it would be an easy matter for an astute or scheming counsel in any criminal case, on behalf of the defendant, to inject some matter into the record which would imperil the verdict. Obviously, under such practice, it would be difficult, if not impossible, to fix any permanency to a verdict.

Where, as in this instance, a defendant in a criminal proceeding injects illegal evidence, or suffers inadmissible evidence to be received without objection, he cannot afterwards insist upon a reversal of the case upon that ground, and if, upon cross-examination, he asks questions calculated to elicit improper or inadmissible testimony, he must be content to take the answers. In such case he will not afterwards be heard to complain of that for which he was himself responsible, and which resulted from his own acts. "One who permits," says Mr. Bishop, "illegal testimony to be

given to the jury, as shown by his making no objection to it, cannot afterwards claim any privilege on account of its admission.'' Bish. Crim. Law, sec. 997.

In Jacobs v. Bangor, 16 Me. 187, 33 Am. Dec. 652, it was held: ''Where irregular or inadmissible testimony has been received at a trial without objection, that it was considered by the jury affords no just cause for a new trial.''

So, in Bishop v. State, 9 Ga. 121, it was said: ''It will never do to permit a prisoner to hear illegal testimony without objection, and then assign its introduction as error; by such indulgence, advantage will always be taken of the prosecution.'' 2 Ency. Pl. and Pr., 522, 523; 1 Greenl. Ev., sec. 449; 1 Bish. New Crim. Proc., sec. 117; Stone v. State, 23 Tenn. 27; State v. Albee, 61 N. H. 423, 60 Am. Rep. 325; State v. Zimmerman, 3 Kan. App. 172, 42 Pac. 828; Goldsby v. Gentle, 5 Blackf. 436; Hancock v. State, 14 Tex. App. 392; Howard v. City Fire Ins. Co., 4 Denio 502; Lawrence v. Barker, 5 Wend. 301; Harrington v. Inhabitants of Lincoln, 2 Gray 133; Lithographing Co. v. Kerting, 107 Ill. 344; McGillin v. Bennett, 132 U. S. 445, 10 Sup. Ct. 122, 33 L. Ed. 422.

We are of the opinion that the action of the court, respecting the evidence in question, and the requests to charge, cannot avail the appellant in his efforts to procure a reversal of the judgment and new trial.

Nor do we concur with the contention of the appellant that the statements made by prosecuting counsel, which are assigned as error, are such as to warrant a reversal. Viewed in the light of the facts and circumstances disclosed by the evidence, they are not of such character as to justify the setting aside of the verdict of the jury. While a counsel for the prosecution should at all times be circumspect in summing up the case for the jury, and at no time should be unmindful of the fact that it is as much his duty, under his oath, to shield and protect the innocent as to punish the guilty, still he has a right to employ such language, in the discharge

of that sacred duty, as the facts and circumstances in evidence, and a proper conception of right and wrong, may dictate and warrant.

Nor do we think the court erred in overruling the defendant's motion for a new trial, or in refusing, under the circumstances and the practice within this jurisdiction, to permit the defense to introduce oral evidence in support of that motion.

Other questions have been presented herein, and we have examined all of them with care, but have found no reversible error in the record.

The judgment must therefore be affirmed, and the cause remanded for further proceedings according to law. It is so ordered.

BASKIN, C. J., concurs.

McCARTY, J. (concurring).—Counsel for defendant, with much energy and persistency, insist that the court erred in refusing to instruct the jury respecting the alleged revelation referred to in the foregoing opinion, and have devoted much space in their brief to the discussion of this question.

Upon an examination of the record, I find that William Bills, Joseph Smith, Samuel Bringhurst, and James Barlow, who were members of the jury who tried and convicted defendant, were members of the Mormon Church, many of whose adherents believe in the doctrine of revelation. The four jurors were given a critical and searching examination respecting the effect, if any, that the alleged revelation would have upon them in arriving at a verdict, and each of them answered very emphatically that it would have no effect whatever, as he did not believe the statements made by the witness James Sharp, at the preliminary hearing, wherein he claimed that God had revealed to him the locality of Hay's body. The following are fair samples of the questions propounded by counsel for defendant, and the answers given: ''Q. (to Juror Barlow): Do you re-

member of reading in substance that the Honorable James Sharp, while here upon the witness stand in the preliminary hearing, stated that he had accused the defendant of being responsible for the life of his son, or son-in-law, and that the proof would be that within twenty-four hours his dead body would be dug up within a mile of defendant's premises? Do you remember of reading something to that effect? A. Yes, I remember reading it. Q. Do you remember upon cross-examination . . . that he stated that God had revealed it to him . . . ? A. Yes, sir. Q. Would the fact that James Sharp made that statement under oath in a preliminary hearing, or if he should make it again would that in any way influence your verdict against the defendant in this case? A. No, sir. Q. I will ask you, Mr. Barlow, do you believe that God did reveal that to James Sharp? A. . . . I will say in answer to that question that I have not been able to bring my mind into the condition to believe as Mr. Sharp said.''

It will be observed.from the foregoing that counsel for defendant well knew what answers the witness James Sharp would make to these questions, and they were not taken by surprise when they elicited the reluctant statement from him that he had received the revelation referred to. No motion was made by them to have this testimony excluded, and it would have been palpable and reversible error for the court to have stricken it out on its own motion, as it was admissible and the defendant was entitled to it, as it would tend to affect the credibility of the witness Sharp and weaken the force of his entire testimony.

In view of the fact that the only jurors whom appellant claims could have been influenced adversely to him by it had stated under the high sanctions of an oath that they did not believe the testimony of James Sharp on this point, and would not be influenced by it to return a verdict against defendant, and the further fact

26 Utah 23

that this, alleged revelation does not refer to any contested or disputed question in the case, as it is conceded that the body of Hay was in fact found and dug up in the vicinity and near the defendant's premises, I fail to see how it was possible for defendant to be prejudiced by the testimony referred to. I therefore concur in the foregoing opinion prepared by Mr. Justice BARTCH in this case.

## ON REHEARING.

### (Sept. 17, 1903.)

McCARTY, J.—A petition for a rehearing has been filed in this case. The principal ground upon which the motion is based is that the court below overruled a motion to permit the defendant to introduce oral testimony in support of an allegation in the motion of misconduct on the part of the jury while viewing the premises of the defendant and those where the body of the deceased was found. The record shows that at the conclusion of the reading of the affidavits filed by defendant in support of the motion and counter affidavits filed by the State the court ruled that the affidavits in support of the motion were insufficient to authorize the court to permit the introduction of oral testimony in support of it, whereupon the counsel for defendant stated orally to the court that Royal B. Young, one of the officers in charge of the jury, while viewing the aforesaid premises, pointed out to the jury where certain blood stains were found, and that the same officer, while escorting the jury over the premises of defendant, was asked certain questions about the condition in which said premises were in at the time the body of the deceased was discovered, and talked about other matters that had been brought out in evidence on the trial of the case. Counsel for the defendant further stated to the court that the officer, Royal B. Young, who was present in court at the time, refused to make affidavit as to what

he knew respecting the conduct of the jurors on that occasion. Counsel, in concluding his remarks, said as follows: "That is what I desire to prove, and desire to take an exception to the ruling of the court. The Court: The court has not ruled yet. Do you desire an objection, Mr. Eichnor (addressing the attorney for the State)? Mr. Eichnor: The State objects to it because it is not in proper form, and there is nothing in the original motion of that kind. The Court: 'The court will take an adjournment to permit you to get the affidavit of Mr. Young. I take it, if Mr. Young, as an officer of this court, has any facts, he will make an affidavit. The statute provides these matters must be by affidavit. We will take a recess until 2 o'clock. Mr. Eichnor: I understand Mr. Young refuses to make an affidavit, and there is no power to compel him to make an affidavit. The Court: The court will take a recess until 2 o'clock. In the meantime you may apply to Mr. Young to make an affidavit, and, if he does not then make an affidavit, the court will then decide the question. Mr. Eichnor: The court does not order Mr. Young to make an affidavit. The Court: No, the court has made no order. Mr. Eichnor: If Mr. Young refuses to make an affidavit, he has that right. Mr. B. J. Stewart: If the court please, we have asked Mr. Young to make an affidavit. The Court: The court has made a ruling on this matter, and has adjourned until 2 o'clock. You may apply to Mr. Young to make an affidavit, and, if he refuses, at that time you may apply to the court for further order. (Recess at 11 a. m. until 2 p. m.)'' The record shows that at 2 o'clock p. m. the matter was again taken up, and the following occurred: "The Court: Anything further to offer? Mr. B. J. Stewart: Nothing further to offer. The Court: No authorities to present? Mr. B. J. Stewart: No authorities. The Court: The motion of the defendant will be denied." It will thus be observed that the court, in the presence and hearing of Mr. Young, in effect stated that it would be proper for Mr. Young to make

an affidavit of any facts that he was in possession of respecting the matter in issue, and thereupon adjourned court for the purpose of enabling counsel to see Mr. Young and procure his affidavit, and, should he refuse, that they might again bring the matter to the attention of the court, and an order would be made as the facts and circumstances warranted; that later on counsel came into court, and announced that they had nothing further to offer, and the court denied the motion to introduce oral testimony as originally made. What effort, if any, counsel for defendant made during the time of adjournment to get an affidavit from Mr. Young does not appear. For aught there is in the record, they may have seen Mr. Young, and on further inquiry and investigation decided that they did not want his affidavit. Under these circumstances the court did not err in overruling the motion. After a lengthy and somewhat vigorous discussion of this question in the motion for rehearing, counsel for defendant say: "We respectfully submit, with all due deference to this court, that the defendant and the bar of this State are entitled to know under what circumstances, if any, oral evidence may be introduced in support of a motion for a new trial on the grounds of misconduct on the part of the jury." It is not necessary for this court to determine in this case under what circumstances, if any, a court will be authorized to permit the introduction of oral testimony in support of a motion for a new trial, as it is plain that the court in this case did not err in its ruling on this point.

I therefore join with my Brethren in overruling the motion for a rehearing.