## THE STATE OF UTAH, Respondent, v. PETER MORTENSEN, Appellant.

### No. 1516.  (74 Pac. 120, 350.)

1. **Res Judicata: Decision on Appeal from Judgment After Motion for New Trial Overruled.**

   The decision of the Supreme Court on appeal from a judgment denying a motion for a new trial based on the ground of the misconduct of the jury is *res judicata* on a subsequent application for a new trial based on the same ground, though the affidavits supporting the second motion show more in detail the misconduct complained of.[1]

   MARIONEAUX, District Judge, dissenting.

   (ON RE-HEARING.)

2. **Criminal Law: Appeal: Rehearing: Misconduct of Jury: Questions Previously Considered.**

   Accused appealed from a judgment of conviction, relying on the alleged misconduct of the jury while making an examination of his premises, and on the ground that the trial court had refused to compel the one who had charge of the jury during the view to testify as to the conduct of himself and jury. The grounds were considered and the cause remanded, and on re-hearing the same questions were again reviewed and considered. A motion for a new trial was then made on the ground of newly discovered evidence relative to the conduct of the jury, and it was again asked that the one who had charge of them be allowed to testify, and from an order denying it accused appealed, but the appeal was dismissed on the ground that the points had been raised and determined previously. *Held,* that a petition for re-hearing could not be

---

[1] Kruntz v. R. G. W. Ry. Co., 13 Utah 1.

entertained, it appearing that the identical questions raised were those twice considered.

**3. Same: Facts Considered and Held ` No Prejudicial Misconduct.**

On a prosecution for homicide, the state claimed that defendant had lured deceased to defendant's residence on the pretense that he would pay him a sum of money owing him, but that defendant killed deceased in order to get possession of certain papers. The theory advanced by defendant was that defendant kept the money which he laid on a shelf on his cellar wall, and that he paid the money. The officer in charge of the jury, when they were taking a view of the premises, pointed out the wall on which it was claimed defendant kept the money, and, pointing out another place, said, "Here is where were found the blood spots;" and, when they came to the grave where deceased had been buried on the premises, he repeated the words which defendant had used when the body was uncovered in the grave: "Oh, Jimmie, you have been roughly handled." *Held,* that there was no misconduct prejudicial to defendant.

(Decided October 30, 1903.)

Appeal from the Third District Court, Salt Lake County.—*Hon. C. W. Morse,* Judge.

The defendant was convicted of murder and from a judgment denying a second motion for a new trial and from an order refusing his application for a certificate of probable cause, he appealed.

DISMISSED.

*Messrs. Stewart & Stewart* for appellant.

*Hon. M. A. Breeden,* Attorney-General, and *Hon. W. R. White,* Deputy Attorney-General, for the State.

BARTCH, J.—This case was before us on a former occasion on appeal from the judgment after a motion for a new trial had been overruled. We then, upon very careful examination of the whole record, and upon

27 Utah 2

such discussion of the various questions of law presented and involved as we then deemed necessary and important, affirmed the judgment, and remanded the case to the trial court for further proceedings according to law. 26 Utah 312, 73 Pac. 562. Soon after the remittitur was sent down, the defendant filed another motion for a new trial. Upon the hearing the court overruled the motion, and, this being a case of murder in the first degree, sentenced the defendant to be executed on November 20, 1903. Thereupon he again appealed to this court from the judgment, assigning as error the action of the court in overruling his second motion for a new trial. The trial court, upon application therefor, refused to grant the defendant a certificate of probable cause, and that matter is also before us.

The State has challenged the standing of the appellant in this court by a motion to dismiss the appeal upon the grounds, as stated in the motion, "that this court has passed upon every question presented in this appeal on a former hearing of this cause; and that there is no new matter presented on the second motion for a new trial, from the overruling of which this appeal is taken." After careful examination of the affidavits and matter presented in support of the motion for a new trial, which motion forms the basis for this appeal, we are of the opinion that the motion to dismiss is well founded. The questions presented on this appeal relate to the alleged misconduct of the jury while viewing the premises where the homicide was committed, and to the refusal of the court to require the officer who had charge of the jury at the view, upon his refusal to make affidavit, at the request of the defense, to give oral testimony concerning the alleged misconduct of the jury, which testimony was to be used in support of the motion for a new trial, instead of an affidavit. These same questions were presented on the former appeal, were considered by us with much care, and decided adversely to the defendant, although without extended separate discussion of the particular points.

Counsel for the defense, however, insist that the affidavits in support of the motion for a new trial now disclose material facts prejudicial to the rights of the defendant, which were not presented to the court in support of the former motion. We perceive nothing in the present affidavits to warrant this contention. It is true the former affidavits did not present so much in detail the alleged misconduct as do those now presented, but at the hearing of the former motion, in addition to the affidavits then presented, counsel for the defendant made to the court an offer of what he proposed to prove by the oral testimony of the officer who refused to make an affidavit. That offer, as contained in the record of the former appeal, covered about two pages of typewritten matter, showing very fully what the alleged misconduct of the jury and officer was; and the same was considered by the court in connection with the affidavits, as shown by the record of proceedings, appearing in the former abstract, which record, so far as material here, reads: "The Court: The court does not understand the offer. At this time you are asking to have that statement become a part of your affidavit, and sworn to as being true by you. Mr. B. J. Stewart: I wish to have the statement which I have made with reference to the testimony that I desire to put in, the proof and the facts that have been set forth as being able to prove by Royal B. Young— I say I wish to have that statement considered in connection with the affidavit which was heretofore filed. Like the record to so show; that I desire to have that incorporated. The Court: The court will consider it in connection with your affidavit. Mr. B. J. Stewart: So that it may become part of the record? The Court: It is part of the record, certainly." Upon examination and comparison, it will be seen that the proposed testimony thus presented in an offer and received to be considered by the court in connection with the matter contained in the affidavits is substantially the same as the matter contained in the present affidavits, in so far as the alleged mater-

ial facts are concerned. The affidavits now re-
lied upon simply present the conduct of the jury while
viewing the premises more in detail, and show more
minutely of what the alleged misconduct consists. This
seems to be admitted by counsel for the defense in their
brief filed on this appeal, when, after stating what they
claim to be the substance of the affidavits filed in sup-
port of the former motion for a new trial, they say,
"The present affidavits show more fully of what the
misconduct consisted." There is no claim that any of
the jurors were biased or prejudiced against the ac-
cused, or that any of them had, before they were called
as jurors in the case, formed or expressed an opinion
as to the defendant's guilt. From a perusal of this rec-
ord the conclusion is irresistible that no right to a sec-
ond appeal has been shown. The same questions now
presented having been before this court on the for-
mer appeal, and having been considered and de-
cided on that occasion under facts of the same char-
acter, they must now be regarded as *res judicata.*
This appeal is, in effect, an appeal from our own judg-
ment, and must fail. It can not be maintained. Kruntz
v. Rio. Grande West. Ry. Co., 13 Utah 1; Abbeville Elec-
tric L. & P. Co. v. West El. S. Co., 44 S. E. 952.

The case of State v. Morgan, 23 Utah 212, 64 Pac.
356, relied upon by the defense, is not in point. It can
readily be distinguished. There the affidavits filed in
support of the second motion for a new trial showed that
two of the jurors who convicted the accused had, pre-
vious to the trial, formed and expressed unqualified
opinions adverse to the defendant, and that they were
prejudiced, and acted under the influence and bias in
the consideration of the question of his guilt, although
when they were examined upon their *voir dire* they an-
swered that they had neither formed nor expressed an
opinion as to the guilt of the defendant. Nor were the
matters set out in the affidavits in that case before the
court at the first trial; nor were they in the record on
the first appeal. In fact, as appears from the record,

the contents of the affidavits were not known to either the defendant or his attorneys until after the judgment had been affirmed by this court. As has been shown, here it is otherwise. It is plain to be seen that if such an appeal as is here attempted could be maintained, it would be difficult, if not impossible, to fix any stability to a verdict. Suppose we were to hold this appeal well taken, and were again to affirm the former judgment, could not counsel again, as in this instance, appear in the lower court, interpose a third motion for a new trial upon some of the same grounds that were contained in the former motions, and support the motion by another set of affidavits which would show still more fully the matters previously ruled upon, and, upon the motion being overruled, again appeal to this court, and thus repeat the process ad infinitum, prolong litigation, and defeat justice at their mere pleasure? To state the proposition contended for in this case is sufficient to condemn and reject it.

We are of the opinion that this appeal should be dismissed, our former judgment remain undisturbed, and the application for a certificate of probable cause denied. It is so ordered.

BASKIN, C. J., concurs.

MARIONEAUX, District Judge.—I dissent from the majority of the court in dismissing the defendant's second appeal from the judgment of the lower court. I do so because it is clear to me beyond reasonable controversy that he has not had such a trial as the Constitution of Utah guaranties to every person accused of crime. Const. art. 1. sec. 12, provides that "in criminal prosecutions the accused shall have the right to be confronted by the witnesses against him, . . . to have a speedy public trial by an impartial jury, . . . and the right to appeal in all cases." It appears from the record that the defendant and James R. Hay were neighbors and residents of Forest Dale, in this county and State. Hay was an employee of a lumber company

in this city, and the defendant a contractor doing business with the company. He was indebted to the company, and on the evening of December 16, 1901, at the company's office, a statement of his account was agreed upon between him and George E. Romney and said James R. Hay. Defendant paid a portion of the amount and represented to Romney and Hay that he had at his home a sufficient sum to pay the balance, $3,800. When Hay left the office that evening, he took with him a receipt for that sum, made out in favor of the defendant. Hay arrived at his home at about 8:25 p. m. After having partaken of his supper, he left his home, saying he was going over to the defendant's home to collect some money. That night he was killed, and on the morning of December 18, 1901, his body was found buried in a field a short distance from the defendant's home, and was identified by one Royal B. Young, the defendant being present with him at the grave. The defendant was arrested, and held pending developments, and meanwhile was subjected to constant and searching interrogation. One statement he made at this time was that he had kept the $3,800 in glass jars on a ledge in his cellar; that Hay came to the house for the money on the night in question, and that he counted out the money and handed it to Hay as he and Hay sat together on a settee. He was finally charged with the crime, and put upon his trial, and this explanation was given in evidence against him. The theory of the State was that he did not have the money to pay the balance due the lumber company, and that he murdered Hay to gain possession of the receipt, so that he might claim to have paid Hay, and be able to produce the receipt as proof of his claim, and the State insisted that the settee Mortensen referred to was so small that it was improbable that he and Hay sat upon it together, as claimed by Mortensen.

One John Allen testified that he saw the defendant with a shovel on his shoulder at about 10:20 p. m., of the night the crime was committed. Upon the sugges-

tion of the State, the jury were sent out to view the premises, and said Royal B. Young accompanied them. Neither the judge of the trial court, nor the prisoner, nor his counsel went with them. Mr. Young took the usual oath not to talk to the jury about the case. The jury returned a verdict of guilty of murder in the first degree. Thereupon the defendant made a motion for a new trial on the ground of misconduct of the jury and of said Royal B. Young when viewing the premises, and upon the hearing of the motion counsel for defendant read the affidavit and made the offer hereinafter set out in the column showing what was before the court on the "first motion for a new trial," and prayed the court to allow him to call to the witness stand and examine under oath said Royal B. Young; but this the trial court refused to allow, and in disposing of the motion for a new trial said: "I have treated the affidavit filed by counsel as the best evidence of the facts contained in it that the case in its nature is susceptible of under the showing made, and will assume that the stepping off, which is alleged in the affidavit to have been made, was made. . . . In this case there seem to be no disputed distances, . . . and the fact that they were stepped off in that way could not in any way militate against the defendant. . . . The court is compelled to the view that, even though the distances mentioned in the affidavit were so stepped, it would not constitute misconduct on the part of the jury." The motion was accordingly overruled. An appeal was then taken to this court from the judgment and from the order of the court overruling the motion for a new trial, and this court, in affirming the judgment of the trial court, said that there was no misconduct on the part of the jury. See State v. Mortensen, 26 Utah 312, 73 Pac. 562.

On the return of the remittitur to the trial court, the defendant made a second motion for a new trial on the ground that additional evidence had been discovered by him regarding the conduct of said Young and the jury upon the viewing of the premises. This second

motion was supported by the affidavits of counsel for defendant and Alma H. Rock, one of the jurors, wherein they deposed as hereinafter set out in the column showing what was before the court on the "second motion for a new trial." This second motion for a new trial came on for hearing on the 3d day of October, 1903, when the said affidavits were read to the court, and Royal B. Young was called to the witness stand by defendant's counsel and sworn, but immediately upon his giving his name the court interposed, and said, "I do not care to hear any oral testimony." Then, in passing on this second motion for a new trial, the court said: "From the affidavits, taking all of the statements to be true, the court is of the opinion that they do not disclose any misconduct on the part of the jury or of the special officer. The motion for a new trial therefore will be denied." Thereupon the defendant again appealed, and the case is now before us on this second appeal from the judgment and the second order of the court denying a new trial.

The first question raised is as to the right of the defendant to prosecute a second motion for a new trial. The question must be considered as decisively settled in the affirmative by the case of State v. Morgan, 23 Utah 212, 64 Pac. 356. In that case the defendant was convicted of murder in the first degree. He made a motion for a new trial, and, upon the motion being overruled, he appealed to this court, where the judgment was affirmed. Thereafter he made a second motion for a new trial upon the ground that certain members of the jury which convicted him had, before they were called and sworn as jurors, expressed an opinion to the effect that he ought to be convicted, and had made other statements tending to show that they were prejudiced against him, and upon *voir dire* had concealed their prejudice. It thus appeared that the constitutional provision that the defendant is entitled to a trial by a fair and impartial jury had **probably** been violated. I say probably, because, **notwithstanding** their statements

tended to show that they had been prejudiced, they may not have actually been prejudiced against the defendant. The trial court denied the second motion for a new trial, and upon Morgan's second appeal to this court the judgment and order of the court below were set aside, and a new trial of the action ordered. So, in State v. Robert L. King and James Lynch, 27 Utah 6, 73 Pac. 1045, King was convicted of murder and the evidence upon the trial tended to prove that on the evening of the 10th of September, 1900, a certain man entered a store in this city and purchased from one William Meyers three handkerchiefs and a satchel, and the satchel was wrapped in a brown paper; that about 3 o'clock in the morning of the 11th of September three men entered a gambling room in Salt Lake City for the purpose of robbery; that their faces were concealed by the handkerchiefs bought from Meyers; that in the attempt to rob a man was killed; that after the killing King was arrested, and charged with the crime. Upon the trial William Meyers testified that he recognized the defendant King to be the man who had bought the satchel and handkerchiefs from him. An officer went to the room occupied by King, and there found a piece of brown paper, which Meyers testified was the same kind of paper used by him in wrapping up the satchel he sold to King. Another witness (William Wittenberg) testified that immediately after the attempted robbery he saw two men come from the direction of the gambling house and run through an alley, and that both had handkerchiefs over their faces, and that when one of them got near him he pulled the handkerchief off, and that the other man pulled the handkerchief off his face at the back door of the Casino saloon before entering the saloon, and that he (the witness) then ran around to the front door of the saloon, and, entering, there recognized the man whom he had seen remove the handkerchief from his face at the back door and the man the witness thus declared he recognized was the defendant, King. King, upon being convicted, appealed to

this court, and the judgment of the lower court was affirmed.  24 Utah 482, 68 Pac. 418, 91 Am. St. Rep. 808.  After the affirmance of the judgment, and upon February 25, 1902, the defendant made a motion for a new trial upon the ground of newly discovered evidence, and based his motion principally upon the affidavits of William Meyers and William Wittenberg, who deposed that, after seeing a photograph of one Strange, a convict then in the Colorado State Prison, they thought they were mistaken in the testimony given upon the trial whereby one identified King as the man who had bought the handkerchiefs and satchel and the other identified him as the man who had removed the handkerchief from his face at the back door of the saloon, and that it was more probable that the man was Strange, the convict, and not King.  The trial court was not satisfied with this showing, and denied a new trial.  Thereupon an appeal was taken to this court, and the judgment was reversed, and a new trial was ordered.  These cases clearly show that a motion for a new trial may be interposed after the judgment of the trial court has been affirmed by this court upon appeal.

The defendant in the case at bar does not claim that he has not had a trial by a fair and impartial jury, nor does he claim that any of the witnesses that testified against him on the trial were mistaken; but his ground of complaint is that he has been deprived of a constitutional right in this; that he was not confronted by the witnesses against him, or—which is the same thing—that the jury received evidence out of court, in the absence of him, the defendant, and of his counsel, and of the judge of the trial court.  It will not be denied that the provision of the Constitution already quoted requires that all evidence received by the jury after they have been sworn to try the case must be in the presence of the defendant.  I presume it will not be contended that, if a witness has once been sworn in a case, and examined in the presence of the defendant, that he may thereafter give testimony to the jury in the

absence of the defendant and out of court, even if it be
the same testimony given on the witness stand. In the
case of People v. Dowdigan, 67 Mich. 92, 34 N. W. 411,
the testimony of a witness at the preliminary hearing
of the defendant had been taken down in writing, and
was read to the jury at the trial in the district court,
and after the jury had retired to consider their ver-
dict this testimony was sent to the jury room by the
trial judge, and was there read by the jury. This fact
having been discovered by the counsel for defendant,
a motion for a new trial was made on the ground that
the jury had received evidence in the absence of the
defendant. The motion was overruled by the trial court
but upon appeal the judgment was peremptorily set
aside, and a new trial ordered; the higher court say-
ing, "In criminal cases the testimony is always to be
in open court, and in the presence of the accused." Our
statute, to give effect to the constitutional provision,
specifically provides that the court may· "grant a new
trial when the jury shall have received out of court any
evidence other than that resulting from a view of the
premises     or     any     communication   .   .   .   referring
to   the   case."       See section 4952, subd. 2, Rev.
St. 1898. The most cursory reading of the affidavits
presented on the second motion for a new trial, the sub-
stance of which is hereinafter set out, will show clearly
that the jury did receive from Royal B. Young, out of
court, evidence "other than that resulting from a view
of the premises." It is claimed, however, on the part
of the State, that no new facts were presented to the
trial court on the second motion for a new trial; that
the same facts had been presented on the first motion;
and that, therefore, the matters alleged are *res judicata*
by the first order overruling defendant's motion for a
new trial. I find myself not only unable to agree to
this contention, but totally unable to comprehend why
it should be advanced, being so manifestly and over-
whelmingly contradictory to the record in the case. This
contention of the State need not be the subject of ex-

tended discussion.    It can be completely overthrown by placing side by side a statement of the substance of the affidavits ( so far as they relate to the evidence received by the jury upon the occasion of the view) presented upon defendant's first motion for a new trial, with those presented upon the second motion for a new trial—witnesseth :

First Motion for New Trial.

Mr. Stewart: I offer Mr. Young to prove that while the jury were viewing the premises at Forest Dale certain of the jurors (naming them) stepped distances between Mortensen's house and Hay's house, and the width of the street; that Mr. Barlow (a juryman) discussed the distances between those places and one of the jury disagreed with Mr. Barlow, and stepped the distances for himself; that Young took the jury into the defendant's house; that they went into the cellar after inquiring the way to the cellar of Mrs. Lizzie Mortensen; that they measured the distances from one side of the cellar to the other, and from the window of the cellar to certain parts of the cellar; that Mr. Young told the jury that the cellar was in a different condition at the time of the murder; that, after leaving the cellar, they went into the kitchen, and one of the jurors asked Young if this was the room Mortensen went out of the night Hay left Mortensen's home, and also inquired if that was the room Hay and Mortensen went through—went out of—and that Young said that it was; that the jury went to the railroad track, where the witness Allen testified he saw Mortensen, and stepped certain distances there both east and west of the track; that the jurymen asked where the blood was, and he pointed out where the blood was, and described the grave and the changes.

Mr. Stewart also presented an affidavit, which, so far as material, read substantially as follows: That he (Mr. Stewart) had been informed by Royal B. Young and others that certain jurymen (naming them), while viewing the premises, measured and stepped off and computed certain distances, for the purpose of using the same as evidence in the case against defendant. (Here the affidavit specifies the same measurements referred to in the "offer to prove.")    That said jury did make other and various measurements, and asked various questions pertaining to

Second Motion for New Trial.

Mr. Stewart presented on this, the second motion for a new trial, his affidavit to the effect: That he, on September 29, 1903, after the disposition of the first motion for a new trial, and after the affirmance of the judgment of the trial court in overruling the first motion, and after repeated prior refusals to give him any further information than that presented upon the first motion, had been informed by said Royal B. Young that when the jury went to view the premises they went into the cellar, and while in the cellar a number of them asked him where the ledge or wall was upon which the money that Peter claimed to have had was put, and that he (Young) thereupon walked over to the ledge which he understood was the place where the jars were supposed to have been placed on the wall, and where the dust would have been disturbed, and then and there pointed out the wall which he believed to be the wall testified to in the case as the wall upon which the money had been placed.    That there was a settee in a room in the house where it was claimed by Mortensen he and Hay sat together when he paid Hay the thirty-eight hundred dollars, and the jurymen asked if that was the settee, and that he (Young) replied that he thought it was, and went and asked Lizzie Mortensen, and she said it was, and that he then told the jurors that Mrs. Mortensen said that the room and the settee were those referred to.    That when the jury reached a point on the railroad track beside the grave wherein the deceased had been buried that he (Young) pointing to the south rail of the track said, "Here is where we (referring to himself and Mortensen) first saw any indication of a crime.    When we first came here the blood was on the rail. It appeared to us that the body had fallen over on the south side of the grade, and had been dragged across the track down the north side of the grade, and

said premises and said surroundings for the purpose of using the same in determining the verdict, and consulted and talked with each other about the premises and the case.

was thrown over the fence." That one of the jurors asked Mr. Young if the body had been dragged under the fence, and that Mr. Young said the body could not have been dragged under the fence; that it was thrown over, as the snow was not disturbed under the fence. That one of the jurors asked him how the wire was at that time (referring to the 18th of December), and Mr. Young replied that the wire was then tight. That after this conversation the jurymen got over the fence and went over to the grave. That Mr. Young was asked by one of the jurors as to the size of the grave (referring to the size on December 18th), and Mr. Young answered that it was a little wider and a little longer now and not quite so deep as it originally was, because so many people had laid down in the grave, and that there had also been some digging around the grave to see if the hat could not be found where the body was found; both ends of the grave had apparently been gophered out. That he (Young) told the jury that the head (of the deceased) had been pushed in that portion that was undermined as far as the shoulders. That one of the jurors then asked about the tracks to the grave, and Mr. Young answered that he could not tell whether all the tracks had been made by one man or not. That the jurymen asked him (Young) a number of questions pertaining to what he and the defendant, Mortensen, did when they went to the locality where the body of Hay was found on December 18, 1901, and that he answered them as near as he could remember.

Mr. Stewart also presented and read an affidavit from Alma H. Rock, one of the jurors, and Mr. Stewart's own affidavit shows that he had read Rock's affidavit to Mr. Young, and that Mr. Young admitted that the statements made by Rock were substantially correct. Mr. Stewart's affidavit also shows that Rock's statements were made to him after the affirmance of the judgment on the first appeal, and that there was no opportunity to present them on the first motion. Rock deposed to the following facts: That he was one of the jurors that tried the case. That Young conducted the jury into the defendant's cellar. That certain distances were measured and stepped off. That Young took the jury to the intersection of the railroad tracks. That there certain distances were stepped east and west, for the purpose of determining the locality where Mortensen, accord-

ing to the testimony of John Allen, the motorman, stood on the night of the murder. That thereafter the jury were taken to a point on the track directly south of the grave, and Young said to the jury: "This is where Hay's head is supposed to have struck when he fell." Here is where it appeared that the body had rolled down the side of the grade or track. The mark was there (referring to the "mark" on December 18th). That Young then directed the jury from the north side of the track to the wire fence, and said: "Here is where the body is supposed to have been thrown over the fence. When I first got over or through at the time we discovered the body, the wires were tight." He then pointed out where they (Mortensen and himself) had gone through the fence, and he told us that there was snow on the ground at the time he and Mortensen discovered the body, and he described minutely the trails or footprints that he saw at that time, and he also pointed out where he had seen a track leading from the grave towards a slough to the west. He also showed how the tracks, when he first came to the fence, led from the fence to the grave, and the distance they were apart, and the probable manner in which the steps were taken to the grave. He also told us there were two sets of tracks. He also told us that on the north side of the fence there was an imprint or mark on the snow, where it semed that something had been there. When we got to the grave he described to us minutely how he and the defendant found the grave, and what they saw, as follows: He said the ground was frozen, and that it appeared that the grave had not been dug quite long enough (in the first instance), and that then he (the man who committed the crime) had taken a shovel and scooped out the west end, and shoved the head in under pretty near down to the shoulders, so that there was a sort of hood or frozen cover, and that Mortensen, the defendant, removed the frozen clods, and that he and Mortensen found an overcoat drawn over Hay's face.

If Royal B. Young was guilty of the conduct thus imputed to him—and Mr. Stewart on his oath declares that Young admits Rock's affidavit to be substantially true—he was guilty of the most culpable violation of the order of the court and of the oath he took when

about to conduct the jury to view the premises. It will not do to contend in this connection that the affidavit of the juror Rock cannot be received to impeach his verdict. I am not considering it for any such purpose. Mr. Young having admitted to Mr. Stewart that the affidavit is true, it is equivalent to a statement by Young himself to Stewart of the facts sworn to by Rock, and stands on the same ground as other statments made by Young to Stewart directly. If one person charges another with misconduct, and he admits the charge, this may be shown as an admission by the latter, notwithstanding that the person making the accusation cannot, because of some positive rule of law, be admitted to prove the charge. If a man's own wife accuses him of a crime, and he acknowedges the truth of the charge in the presence of a third person, the latter may testify to the fact as an admission, not withstanding the incompetency of the wife to testify against the husband. The consideration of Rock's affidavit in connection with Young's admission of its truth is no violation of the rule that a juror cannot be heard to impeach his own verdict.

It is argued on behalf of the State that, if it should be admitted that on the second motion for a new trial additional evidence of the misconduct of the jury in receiving evidence out of court was presented, the trial court below did not err in denying the second motion, because, it is claimed, the first motion was upon the same general grounds, even if not supported by the same evidence, and that, therefore, it is *res judicata* that the jury did not receive evidence out of court. This claim, in effect, is that, if a motion for a new trial is made and based, for example, upon the claim that a particular juror had accepted a bribe, and the evidence adduced upon the hearing of the motion should be insufficient to sustain the charge, and the motion should therefore be denied, thereafter a second motion for a new trial could not be interposed upon the ground that a different juror had accepted a bribe. No authority has been

cited to this effect, and after the most diligent search I
have been unable to find a single case which sustains
the contention. I am convinced that there are no such
decisions. A motion for a new trial is analogous to the
old proceeding in equity by bill to secure a new trial of
an action at law on the ground of newly discovered evi-
dence. In the early history of the common law it seems
that motions for new trials were unknown, and that if a
party defeated in an action at law should, after judg-
ment, discover new evidence, which, if it had been ex-
hibited at the trial, would probably have produced a
different verdict, he had no recourse except by a suit in
equity for a new trial. Now, this suit was like any
other suit in the court of chancery, and, if the plaintiff
failed to establish that he was entitled to a new trial, and
the decree went against him, he might have a bill of re-
view, if, after decree, he discovered new evidence of
such a character that, had it been produced upon the
hearing, a new trial would have been decreed. The
modern codes of law providing for the granting of mo-
tions for new trials and dispensing with a separate suit
in equity for that purpose were not designed to
narrow and diminish the rights of suitors, but rather
to widen and increase them. So a motion for a new
trial being made under our practice, the moving party
is substantially a plaintiff in a collateral action, and if
he fails to establish a case that warrants a new trial of
the principal issue, and the motion is therefore over-
ruled, there appears to be no reason why, if subsequent-
ly he discovers new evidence of such a character that,
if it had been produced upon the hearing of the mo-
tion, a new trial would have been granted, he should not
have a rehearing of the motion, or be permitted to main-
tain a second motion on the ground of newly discovered
evidence. The motion for a new trial may be very prop-
erly regarded as an independent suit tried before the
court, and this is especially true when issues of fact are
raised upon the motion. It has never been supposed
that an application for a new trial on the ground of

newly discovered evidence relating to a fact in issue and passed upon in the cause could be successfully resisted by invoking the doctrine of *res judicata,* and I can perceive no reason why, upon an application for a rehearing of a motion for a new trial (and a second motion to the same effect as the first is in effect an application for a rehearing) upon the ground of newly discovered evidence, the opposing party should be permitted to claim that the issue is *res judicata.* It is to illustrate this view that I have set out so fully the facts in the case of State v. King, supra. The question of the identity of King with the man who removed his handkerchief at the back door of the saloon was a fact in issue in the case, and almost of necessity must have been determined by the jury, and the verdict perhaps was a declaration that it was King, and, so long as the verdict stood, perhaps the issue was *res judicata.* But when, upon a motion for a new trial, other evidence was produced tending to prove that the witnesses that identified King were mistaken, no one thought of contending that the doctrine of former adjudication had any application to the case. Probably it was *res judicata,* but the adjudication was wrong, according to the contention of the defendant, and his motion for a new trial was to give him an opportunity to prove that the fact should be adjudicated otherwise; and this court, being satisfied that with the new evidence it might be adjudicated otherwise, granted King a new trial. So, in the case before us, the trial court upon the first motion for a new trial adjudicated that Young and the jury were not guilty of misconduct, but, new evidence of the alleged misconduct having been discovered, no legal reason existed why the new evidence should not be heard and considered by the trial court; and the fact that it had decided on the first motion, on other evidence, that the jury had not misconducted themselves, was no obstacle to a decision to the contrary upon new and fresh evidence being offered. BARTCH, J., in Herriman Irr.

27 Utah 3

Co. v. Keel, 25 Utah 96, 99, 101, 69 Pac. 721, said: "On this appeal the appellant insists that the questions now herein presented were adjudicated on the former appeal, and have become *res judicata.* The efficacy of the general rule here invoked is not doubted. The rule, however, is not entirely without limitations. . . . Nor does a decision, as to a question of fact, fall within the rule, when, upon the retrial, material evidence not offered at the first trial is introduced. . . . So, in Mattingly v. Pennie, 105 Cal. 514, 39 Pac. 200, 45 Am. St. Rep. 87, it was said: 'It is settled beyond controversy that a decision of this court on appeal, as to a question of fact, does not become the law of the case' " (*res judicata*). That this is a correct statement of the law would seem to be too plain for controversy, even in the absence of support in judicial decisions, and it therefore seems to me positively frivolous, when an application for a new trial is made on the ground of newly discovered evidence, to say that, because the fact was in issue, and has already been determined against the applicant, that the doctrine of *res judicata* prevents the re-examination of the fact in the light of the newly discovered evidence. This court did not hesitate to grant a new trial as to King in the case of State v. King and Lynch, supra, when newly discovered evidence in respect to King's identity was laid before it, although the fact was in issue on the trial, had been found against him by the jury, and the jury's verdict confirmed by this court upon appeal. It may be objected that in the case of State v. King and Lynch the decision of the point of identity was by the jury in the main case, and not upon a motion for a new trial by the judge; but if we admit—which I think we must—that a motion for a new trial is in its nature an independent and collateral suit triable by the court, what principle forbids the granting of a re-examination of a point in issue in the collateral suit while permitting it in the main action?

This brings us to the questions: Was fresh proof offered upon the second motion for a new trial? Was

it discovered after the disposition of the first motion?
Could it have been discovered and brought forward
upon the first motion? And was it sufficient to author-
ize the trial court to grant a new trial? That the new
evidence was discovered after the denial of the first mo-
tion for a new trial, and could not have been discovered
before, there is no room for difference of opinion. The
affidavit of Mr. Stewart is explicit to the effect that he
first learned of this new matter after the remittitur was
sent down to the trial court, and that his most diligent
and persistent efforts had been unavailing to secure the
information from Mr. Young, or any other person, prior
to that time. He is not contradicted; and Mr. Young,
from whom he finally secured the information, was
present when Mr. Stewart read his affidavit to this effect
in the trial court. Upon the point that it is new evi-
dence that was not before the court on the first motion,
and consequently not before this court on the first ap-
peal, a glance through the parallel columns in this opin-
ion under the captions ''First Motion for New Trial''
and ''Second Motion for New Trial'' will prove to
demonstration that it is new. It is equally clear that
this new evidence is material. As to whether it was
sufficient to authorize or require the court to grant a
new trial of the case on the issue of guilty or not guilty,
I think it was not, because—and only because—it is
hearsay evidence. B. J. Stewart does not depose that
the jury received evidence from Mr. Young, and the
fact can not be proved by the affidavit of Alma H. Rock,
the juror. But Stewart does depose that Young in-
formed him (Stewart) that he was guilty of the conduct
alleged against him by Stewart, and that Young admits
the truth of Rock's affidavit. Upon this being made to
appear to the learned judge of the trial court, it became
his duty, not to grant a new trial upon hearsay testi-
mony, but to call Mr. Young to the stand (he was
present in court), compel him to testify, and permit Mr.
Stewart to interrogate him, as prayed by defendant, and
as, indeed, counsel was proceeding to do when inter-

rupted and forbidden by the court to go further.    Then, if Mr. Young, being sworn and fully examined, should testify substantially to such facts as appear in the affidavits of Mr. Stewart and Mr. Rock, and remain unimpeached and uncontradicted, to grant a new trial.    I am aware that it is claimed that this court decided on the former appeal of this case that Mr. Young could not have been compelled to submit to an examination under oath upon the motion, but an examination of the opinion of the court fails to show that this court has decided as claimed, or even intimated an opinion to that effect.    This court simply said upon this branch of the case that on the (first) motion for new trial nothing appeared that would have warranted the granting of the motion. It is true that BARTCH, J., said that the learned judge of the trial court did not err in refusing to permit Young to testify orally, but that statement was evidently predicated upon the ground that, in the opinion of the learned justice, counsel did not offer to prove by Young facts sufficiently material to authorize the granting of the motion.    Upon the second motion for a new trial the trial judge apparently considered the affidavits of Mr. Stewart and Mr. Rock as evidence, and then held that the jury did not receive evidence out of court other than that resulting from a view of the premises; but I am of opinion that a different holding was clearly and indisputably demanded if the affidavits are to be considered as evidence of what actually occurred.    Young, according to Stewart's affidavit, says that the jury went into the cellar of the defendant's house, where he had claimed he had kept the money ($3,800), and while there the jurymen asked him (Young) where the ledge was where the money was supposed to have been kept, and that he thereupon walked over and pointed out the place which he believed to be the place where Mortensen claimed the money had been kept.    A view of the premises is to enable the jury to apply the testimony correctly.    After seeing the ledge in the cellar, the jury required no further aid from

Young. It was their duty to determine for themselves the particular place on the ledge Mortensen claimed to have kept the money. That fact could not be determined by looking at the ledge. It could only be determined by taking testimony, and Young was not there to give testimony. In that single act he did more than give testimony; he gave the jury his opinion of what the testimony disclosed. Mr. Stewart deposes that Young's repeated refusals to make affidavit were explained by Young's statement to him that he believed the defendant to be guilty. For aught that appears to the contrary, Young may have been of the opinion that the testimony disclosed that the point where Mortensen claimed to have kept the money was immediately opposite one of the windows in the cellar. But, however that may be, Mr. Young's opinion of the testimony was wholly inadmissible in the absence of defendant. I think it was not only misconduct, but the most wicked and prejudicial misconduct.

Mr. Young also told the jury when they were on the railroad track that he and the defendant had been there on the 18th of December, and pointed out to them a particular spot on the rail where on that day he had found blood; and he informed them that it had appeared to him at that time that the body of Hay had fallen on the south side of the grade, and had been dragged across the track and thrown over the fence; that it could not have been dragged under, as the snow on the ground at that time had not been disturbed, and the wire was tight at that time—referring all the time to conditions on the day he had found Hay's body. He told them of the tracks that appeared in the snow on that December morning. He answered questions propounded to him by the jurors in regard to the acts of Mortensen when at the grave of Hay on that morning. He told them that it was his opinion, derived from appearances presented to him at that time (December 18th), that the grave as originally dug was found to be too short, and that therefore the man who had committed the crime

had taken a shovel and scooped out the west end of it, and shoved the head of the dead man in under down to the shoulders. It is absurb to claim that this was not evidence other than that resulting from the view. But Young did not confine himself to giving the jury evidence of the matters he knew. When he could not answer their questions himself, he procured others who could. Witness that when, at the house, the jury observed a certain settee, they inquired if that was the one on which Mortensen and Hay were supposed to have sat down when Mortensen, according to his claim, counted out the $3,800 to Hay, Mr. Young did not know, and so, he says, according to Stewart's affidavit, he went and inquired of Lizzie Mortensen, and then returning informed the jury Mrs. Mortensen said that that was the settee in question. So that the jury not only received evidence from Young, the sworn officer, but likewise from the unsworn woman. The claim of the State was that Mortensen's statement that he and Hay sat together on the settee while the money was counted out was improbable, because the State claimed the settee was too small to be used for such a purpose, and perhaps the settee pointed out by Mrs. Lizzie Mortensen bore out this claim of the State; but perhaps, too, the settee she asserted was the one in question was not the settee Mortensen referred to. We can not be certain that this testimony of Lizzie Mortensen was injurious to the defendant, but the law unquestionably is as laid down by this court in State v. Morgan, supra, that, where anything improper is done that could have prejudiced the defendant, it will be presumed that it did in fact prejudice him, unless, says Justice BASKIN in that opinion, the State will show beyond a reasonable doubt that it did not prejudice him. I would like to have at least some evidence that this misconduct of the jury in receiving evidence from Mrs. Mortensen through Young did not prejudice the defendant, for it is perfectly clear that it may have done so. I have seen many a settee on which one man could not sit without

State v. Mortensen.

demolishing it. And how significant it must have sounded to that jury when Young told them that the grave appeared to have been scooped out with a shovel, when they recalled the testimony of John Allen that he had seen the defendant on the night of the murder with a shovel on his shoulder.

So that I am of opinion that the learned trial judge was clearly in error when he said, on overruling defendant's second motion for a new trial: ''Taking all of the statements [in the affidavits] to be true, . . . they do not disclose any misconduct on the part of the jury or of the special officer.'' The reported cases may be searched from the earliest times, and I am firmly convinced that it will be found that misconduct of this character has never been tolerated by any court. But, notwithstanding, I am of opinion that the trial court should not have granted a new trial upon the evidence by which the misconduct was shown, for, after all, the misconduct alleged may not in fact have happened. Mr. Young should have been permitted to testify orally, and, if he confirmed the accusations made, the State could then have had an opportunity to contradict him. If we adopt the practice that the officer, under the circumstances shown here, cannot be called upon by the defendant to testify, then presumably the State could not call him, and it might thus happen that a new trial would be granted where no misconduct in fact had occurred; and those who alleged it could not even be punished for perjury or otherwise, for the counsel or other person who made affidavit of the misconduct on information derived from the officer could not be held blameworthy for stating truthfully what he had been informed, and the officer could not be punished, for his statement would not have been under oath. It was therefore error against the State to consider the affidavits as evidence, and error against the defendant to refuse to permit Mr. Young to be examined. The error against the State was not prejudicial, but against the defendant it was in the highest degree prejudicial. This error

can be corrected by setting aside the order of the court denying a new trial, and remanding the case, with directions to swear and examine Royal B. Young touching the matters set forth in the affidavits. This was the course pursued in the case of People v. Murray, 94 Cal. 212, 29 Pac. 494, 28 Am. St. Rep. 113.

If it is contended that the case of State v. Morgan, and the case of State v. King throw no light upon this case, the answer is that in the case of State v. Morgan the defendant was awarded a new trial because he had not had a trial, apparently, by a fair and impartial jury, and that this right was accorded him after one motion for a new trial had been overruled, and after the judgment of the court below had been affirmed upon appeal to this court. In the case of State v. King a new trial was granted because it appeared probable that the defendant was innocent of the crime of which he had been convicted.

Now, in the case at bar the application is not made upon the ground, specifically, that an impartial jury had not been secured for the trial, or that the defendant is probably innocent, but it is made upon the ground —and is established in my judgment, beyond reasonable controversy (if the affidavits be taken as proving what occurred)—that the jury received evidence out of court, and in the absence of the defendant and his counsel, and to refuse to grant a new trial under these circumstances is to deny what the Constitution guaranties explicitly to every man accused of crime, namely, that he shall be present whenever evidence is given against him. This guaranty extends not only to the innocent, but to the guilty. In the eye of the law the guilty man has as good a right to this constitutional guaranty, before he shall be punished for a crime, as an innocent man has to go unpunished altogether.

Society in Utah has the right to inflict capital punishment upon one who has been guilty of murder only after a trial in which every constitutional and statutory right has been enjoyed by the defendant, and he has

then been found guilty. If a single constitutional right has been denied him, he cannot be legally executed. There is no difference in principle between punishing a man with death without a trial and punishing him with death after a trial in which he has not enjoyed the rights given by the Constitution and statutes to all persons accused of crime. If one constitutional right may be withheld, all may be withheld; and, if all may be withheld, then lynching is justifiable whenever it is proven that the victim of it was in fact deserving of death.

I have no opinion to express in respect to the guilt or innocence of the accused, and in the disposition of the matter presented to this court upon this second appeal the question of guilt or innocence is clearly an immaterial consideration. An examination of the affidavits set out above makes it clear beyond a reasonable doubt that, if the facts therein stated are true, the defendant has been deprived of one of the most essential safeguards provided by the Constitution for criminal trials. It cannot be doubted that justice must frequently go astray, and that the law itself will become an object of contempt, if jurors, charged with the deliverance of a verdict between the State and the defendant in capital cases, are permitted to receive evidence out of court, away from the judge and the prisoner and his counsel. It does not matter whether they receive much or little. If they receive any, their verdict should be set aside, and a new trial awarded without hesitation.

Knowing, as I do, that the defendant was convicted on circumstantial evidence, where nothing was admitted, and wherein no evidence was offered on behalf of the prisoner (except some evidence tending to impeach the motorman Allen), and believing that the evidence given by Royal B. Young, who was a witness for the State on the trial, and who says he believed the defendant guilty, not only may have been, but unquestionably was, prejudicial, I am compelled to dissent from the order dismissing the appeal herein. The proper order, in my judgment, is that the case should be remanded,

with directions to set aside the order overruling the motion for a new trial, and to permit counsel for defendant to examine the said Royal B. Young touching the matters set forth in the affidavits, and thereupon grant or refuse the motion as the facts require.

## On Rehearing.

### (November 19, 1903.)

McCARTY, J.—On the 14th day of June, 1902, the defendant was convicted in the Third Judicial District Court of this State of the crime of murder in the first degree, and sentenced to be shot. He filed a motion for a new trial, and one of the grounds upon which he based his motion was the alleged misconduct of the jury while they were viewing the premises of the defendant, and other points, in the vicinity of where the evidence shows the crime was committed, and which points had been testified to in the case, and over which there was no contention or dispute. The record shows that, after all the evidence had been introduced, the court, on motion of the district attorney, made the following orders: "The court will appoint Mr. Royal B. Young as a person to accompany the jury and point out the location of the various objects that have been testified to. (Mr. Young was thereupon sworn.) Now, Mr. Young, you may take the jury, and it will be your duty to keep them together, and to take them to the premises in Forest Dale, and point out to them the residence of Peter Mortensen; the residence of the deceased, James R. Hay; the store which has been referred to as Hendry's store; the field in which the place referred to as the grave is located; the location of the various railroad tracks, including the street car track; and the premises surrounding these various objects." After the jury had been conducted to the scene of the homicide, and returned into court, the court stated to defendant's attorneys as follows: "The court has been informed that, upon the

view of the premises by the jury last night, that some of the members of the jury stepped off some distances that have been testified to in the case. The distance between Mortensen's house and Hay's house, and possibly some other distances between points. . . . Mr. C. B. Stewart: We have no objection to offer at all. The Court: No objection to what has been done? Mr. C. B. Stewart: No objection to what has been done, so far as you have stated." The measurements referred to by the court were alleged in the motion for a new trial as part of the misconduct of the jury upon which the motion for a new trial was based. The motion was overruled, and the defendant prosecuted an appeal to this court.

One of the grounds relied upon by defendant for a reversal of the case was the alleged misconduct of the jury while making an examination of defendant's premises and other points near where the crime was committed, that had been referred to in the evidence, and another ground was the refusal of the trial court to compel Royal B. Young to testify orally respecting the conduct of himself and the jury while he had them in charge on that occasion. After a thorough examination of the record, and careful examination of the entire case, this court, in an elaborate opinion, written by Mr. Justice BARTCH, (26 Utah 312, 73 Pac. 562), in which the grounds for a new trial were all considered, affirmed the judgment of the trial court. Defendant filed a motion for a rehearing, and the same questions were again reviewed and considered and the petition denied. (26 Utah 354, 73 Pac. 633.) Thereupon defendant again filed a motion in the lower court for a new trial on the ground of newly discovered evidence, which he claims consisted of additional facts showing misconduct of the jury while they were inspecting the scene of the homicide, and again asked that Royal B. Young be sworn and compelled to testify respecting what he knew of the alleged misconduct of the jury, which the court refused to do, and overruled the motion

for a new trial. From this order the defendant again appealed to this court.

The Attorney-General filed a motion to dismiss the appeal on the ground that the points raised were determined and disposed of on the former appeal. The majority of the court, in the opinion written by Mr. Justice BARTCH (27 Utah 16, 74 Pac. 120), dismissed the appeal, as the questions involved had been considered and determined on the first appeal. By an examination of the record and the several opinions handed down in this case, it will be seen that the identical questions raised by this last appeal and the petition now before us for a rehearing, to-wit, the alleged misconduct of the jury, and the refusal of the trial court to permit Royal B. Young to testify in support of the motion for a new trial, having been twice considered and passed upon by this court, can not now be reopened for further consideration. That appeals cannot thus be multiplied, and the litigation of a case made interminable, is both sound in principle and supported by authority. Windon v. Stewart, (W. Va.) 37 S. E. 630; Cromwell v. County of Sac, 94 U. S. 351, 24 L. Ed. 195; 1 Herman on Estoppel and Res Judicata, 548, and cases cited.

And even if it were conceded, for the purposes of this case, that the last motion filed by defendant for a new trial was based upon newly discovered evidence which raised a different question from those disposed of on the former appeal, the points involved are not based upon, nor do they refer to any fact over which there was any controversy, but, on the contrary, they refer to matters only over which there is no dispute and no conflict in the evidence. The theory advanced by counsel for defendant is that the defendant kept the money which it is claimed he paid to deceased, James R. Hay, on his (Mortensen's) cellar wall, and that on the night of the homicide he paid said money to Hay while sitting with him on a settee in a room of his (Mortensen's) house. The fact that the officer conducted the

jury to this cellar, and pointed out to them the wall on which it was claimed by defendant that he kept the money, was not in any sense giving testimony, nor could such pointing out of the wall possibly have prejudiced the jury. The settee referred to was brought into court during the progress of the trial, introduced in evidence, and viewed by the jury. It was not claimed during the trial, nor is it contended here, that the settee was not the one on which Peter Mortensen claimed to have counted out and paid the money to Hay. It is also an admitted fact that Hay was killed by some one, and buried in a shallow grave in a field near defendant's home. It is not claimed that the officer, while conducting the jury over the premises mentioned, made any remark or suggested anything respecting the guilt or innocence of the defendant, or the merits of the case.

Counsel for the defendant, in their petition for a rehearing, say: ''The defendant feels himself in a better position at this time, on the petition for a rehearing, to present effectively to this court the facts upon which he relies for a reversal, than heretofore, for the reason that the members of this court are in a position to at least form some idea other than from the affidavits as to the truth of the facts and statements set forth in the affidavits filed in support of the second motion for a new trial, on account of their having sat as members of the Board of Pardons during the examination of Royal B. Young before that honorable body. . . . The facts set forth in the affidavits in support of the motion for a new trial were in substance the same as those presented before the Board of Pardons, and therefore would show more fully the good faith of the defendant in presenting the second appeal, supported by affidavits, which affidavits, we believe, stand uncontradicted, not only in so far as the record in this case is concerned, but in view of the hearing before the Board of Pardons. We take it that, with the knowledge which the court now has, there can be no doubt but what the officer, Royal B. Young, who conducted the jury to the

view of the premises, was guilty of misconduct.'' Since
counsel place so much importance in support of their
contention upon the testimony given by Royal B. Young
before the Board of Pardons, which is entirely outside
of the record in this case, we herewith give the substance
of an affidavit of Royal B. Young, filed by the Attorney-
General in the case, the contents of which are in har-
mony with the evidence given by him (Young) before
the Board of Pardons.  The affidavit, so far as mate-
rial, is as follows:  ''That, while having charge of the
jury in viewing the premises, I did not volunteer any
statement as to the commission of the crime with which
the defendant, Peter Mortensen, was charged, as alleged
in the affidavit of Alma H. Rock, except while taking the
jury on the railroad track towards the grave where the
deceased, James R. Hay, had been buried, I said,
'Here's where we first found the blood spots on the
rail;' the language being the same as I used in giving
my testimony in the aforesaid case.  When we came
to the grave, and the jury had viewed the grave where
James R. Hay had been buried, I repeated the words, to
which I had testified in said case, which Peter Morten-
sen, the defendant, used when we had uncovered the
body in said grave, to-wit, 'Oh, Jimmie,' or 'Poor Jim-
mie, you have been roughly handled.'  That I pointed
out to the said jury such objects and points as, to the
best of my knowledge and information, had been testi-
fied to in the case.  That I did not describe to the jury,
while viewing said premises, the conduct of myself and
the defendant on the morning of December 18, 1901,
when we discovered the body of James R. Hay.  That
I did not point out to the jury, or say to the jury, 'Here
is where Hay's head is supposed to have struck when he
fell—right down here.'  That I did not carry on any
conversation with the said jurors as to the alleged hom-
icide, except by answers in response to questions by the
jury relative to the various objects and points of the
premises where it was claimed the crime had been com-
mitted, and as testified to in court in said case.''

This being a case wherein the life of a human being is at stake, we have given the entire case the most thorough investigation and careful consideration, and fail to find anything in the record that would warrant us in changing the conclusions already reached and announced. The petition for a rehearing is therefore overruled and denied.

BASKIN, C. J., and BARTCH, J., concur.